In re SAFETY–KLEEN, et al., Debtors.

Clean Harbors, Inc., Plaintiff,

v.

Arkema, Inc., f/k/a Atofina Chemical, Inc., and also f/k/a Elf Atochem North America, Inc., Helen Kramer Landfill Superfund Site Group, and Ballard, Spahr, Andrews & Ingersoll, LLP, Defendants.

Bankruptcy No. 00–02303(PJW).
Adversary No. 05–50474(PJW).

United States Bankruptcy Court,
D. Delaware.

Oct. 19, 2005.

Toby M. Daluz, Ballard Spahr Andrews & Ingersoll, LLP, Wilmington, DE, Vincent J. Marriott, III, Ballard Spahr Andrews & Ingersoll, LLP, Philadelphia, PA, for Defendants.

Michael R. Lastowski, Duane Morris LLP, Wilmington, DE, Whitton E. Norris, III, Davis, Malm & D'Agostine, Boston, MA, for Plaintiff.

## MEMORANDUM OPINION

PETER J. WALSH, Bankruptcy Judge.

In this adversary proceeding defendants Arkema, Inc., (f/k/a Atofina Chemical, Inc., and also f/k/a Elf Atochem North America, Inc.), Helen Kramer Landfill Superfund Site Group, and Ballard, Spahr, Andrews & Ingersoll, LLP, filed a motion (Adv.Doc. # 5) seeking to dismiss Count III of plaintiff Clean Harbors Environmental Services, Inc.'s ("Clean Harbors") complaint. While the motion is filed pursuant to Federal Rule of Civil Procedure 12(b)(6),[1] both parties have furnished substantial documents relating to matters outside the pleadings. Thus, pursuant to Rule 12(b)(6), the motion will be treated as a motion for summary judgment. For the reasons set forth below, the Defendants' motion will be granted.

1. This rule is incorporated here by Bankruptcy Rule 7012.

2. Individual sections of the Bankruptcy Code will be cited herein as "§ ___".

3. The sale order refers to the "Order (I) Authorizing and Approving (A) Sale of Substantially All of the Assets and Certain Equity Interests of the Debtors' Chemical Services Division To Clean Harbors, Inc., Free and Clear of Liens, Claims, Encumbrances and Interests, and (B) Assumption and Assignment of Certain Related Executory Contracts and Unexpired Leases, and (II) Determining That Such Sale Is Exempt From Any Stamp,

## BACKGROUND

*Introduction*

On June 9, 2000, the Debtor, Safety–Kleen Corp., et al., ("Safety–Kleen") filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code").[2] By order dated June 18, 2002, this Court approved the sale of a major portion of Safety–Kleen's business to Clean Harbors pursuant to § 363. The current dispute involves whether, with the § 363 transaction, Clean Harbors assumed Safety–Kleen's obligations to the Defendants.

Count I of the Complaint seeks a declaration that, pursuant to the Sale Order,[3] Clean Harbors acquired the business free of such obligations. Following the sale and prior to the filing of this adversary proceeding, the Defendants sought to enforce their claim against Clean Harbors in the United States District Court for the District of New Jersey (the "New Jersey Court"). Count II seeks a declaration that those efforts violated the injunction provision of the Sale Order. Count III seeks to hold the Defendants in contempt for that alleged violation of the injunction provision.[4] Presently before this Court is only the Defendants' motion to dismiss Count

Transfer, Recording, or Similar Tax, and (III) Granting Related Relief" (hereinafter the "Sale Order"). (Doc. # 4932).

4. Prior to seeking to enforce its claim in the New Jersey Court, the Defendants filed a motion in this Court in Safety–Kleen's Chapter 11 case seeking essentially the same relief, i.e., a declaration that Clean Harbors assumed Safety–Kleen's obligations to the Defendants. Clean Harbors opposed that motion and it was subsequently withdrawn on procedural grounds. Clean Harbors' Count III does not complain about the pursuit by the Defendants of that motion.

III of the Complaint. Clean Harbors maintains that the Sale Order is clear on the issues of its non-assumption of the subject liabilities and the effect of the injunction provision. The Defendants assert that they cannot be found in contempt because the Sale Order does not unambiguously bar their pursuit of a claim against Clean Harbors. Indeed, the Debtors assert that in fact Clean Harbors did assume Safety–Kleen's obligation to them.

*The Source of Liability*

Prior to the filing of its petition, Safety–Kleen had acquired the business of Rollins Environmental Services (NJ), Inc. ("Rollins"). Rollins had for a number of years operated a waste treatment operation that resulted in the disposal of waste material at a site in New Jersey. That site, later referred to as the Helen Kramer Landfill Superfund Site, drew the attention of the Environmental Protection Agency ("EPA") and the State of New Jersey Department of Environmental Protection ("DEP"). The EPA and the DEP charged various potentially responsible parties ("PRPs") with environmental pollution. Those charges resulted in consent decrees among the EPA, the DEP and the PRPs, including Rollins, to remediate the superfund site with the PRPs paying the cost of remediation.

Although the consent decrees created collective liability for the settling PRPs, those documents did not allocate such liability among the PRPs. Rather, the various PRPs entered into separate settlement agreements (the "Settlement Agreements") among themselves providing for the sharing of the remediation costs. As a result of the Settlement Agreements, Rollins became obligated to the Defendants to provide funds to assist in the remediation

work over the course of a number of years. When Safety–Kleen acquired Rollins it became obligated to the Defendants under the terms of the Settlement Agreements.

*Safety–Kleen's Sale To Clean Harbors*

During the course of the bankruptcy case, Safety–Kleen filed a motion seeking to sell its environmental services division to Clean Harbors. The proposed sale was subject to a detailed Acquisition Agreement (the "Agreement") dated February 22, 2002. The Sale Order was entered on June 18, 2002. As a result of the sale, Clean Harbors assumed certain liabilities of Safety–Kleen. As to liabilities not assumed by Clean Harbors the Sale Order enjoins holders of such claims from pursuing recovery against Clean Harbors. The subject adversary proceeding thus involves the dispute as to whether Clean Harbors has assumed Safety–Kleen's liabilities owing to the Defendants, which liabilities arose out of the Safety–Kleen acquisition of Rollins.

Acting on the belief that Clean Harbors assumed such liabilities, the Defendants filed a motion in the New Jersey Court seeking an order requiring Clean Harbors to pay all monies due from Safety–Kleen under the Settlement Agreements.[5] However, the Defendants voluntarily withdrew the New Jersey Court motion, apparently intending to refile it at a later date. This adversary proceeding was filed in this Court by Clean Harbors before the Defendants' refiled in the New Jersey Court.

Due to the Defendants' attempts to enforce their obligations in the New Jersey Court, Clean Harbors asserts that the Defendants have violated the injunction provisions of the Sale Order. From this, Clean Harbors alleges that this supposedly

---

**5.** The pre-petition environmental litigation involving Rollins took place in the New Jersey Court.

"clear" violation warrants contempt sanctions.

## DISCUSSION

### Standard of Review

In determining whether a claim should be dismissed pursuant to Rule 12(b)(6), the Court may look only to the allegations contained in the Complaint and any exhibits attached thereto. *City of Pittsburgh v. West Penn Power Co.*, 147 F.3d 256, 259 (3d Cir.1998) (citation omitted). But if matters outside the Complaint are presented to and not excluded by the Court, the motion to dismiss "shall be treated as one for summary judgment and disposed of as provided in Rule 56 . . . ." FED. R. CIV. P. 12(b). The decision to consider evidence outside the Complaint and convert a motion to dismiss to one for summary judgment is within the discretion of the Court. *Kulwicki v. Dawson*, 969 F.2d 1454, 1462 (3d Cir.1992) (citation omitted).

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P 56(c).[6] When deciding a motion for summary judgment, the court views the facts, and all permissible inferences from those facts, in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587–88, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Where the record could not lead a reasonable trier of fact to find for the non-moving party, disposition by summary judgment is appropriate. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–49, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

### Contempt Liability

"A plaintiff must prove three elements by clear and convincing evidence to establish that a party is liable for civil contempt: (1) that a valid order of the court existed; (2) that the defendants had knowledge of the order; and (3) that the defendants disobeyed the order." *Roe v. Operation Rescue*, 54 F.3d 133, 137 (3d Cir.1995) (citation and internal quotations omitted). The requirement of knowledge has a corollary: "the order which is said to have been violated must be specific and definite." *In re Rubin*, 378 F.2d 104, 108 (3d Cir.1967) (citations omitted). Put differently, "a person will not be held in contempt of an order unless the order has given him fair warning that his acts were forbidden." *United States v. Christie Indus., Inc.*, 465 F.2d 1002, 1006 (3d Cir. 1972). Further, the long-standing rule in contempt cases is that ambiguities or omissions in an order will favor the party charged with contempt. *Ford v. Kammerer*, 450 F.2d 279, 280 (3d Cir.1971). In sum, the plaintiff must prove by clear and convincing evidence that the defendants violated an unambiguous order in that no other reasonable interpretation of such order existed. *See Harris v. City of Philadelphia*, 47 F.3d 1342, 1350 (3d Cir.1995) (summarizing the applicable standard for contempt).

### The Injunction

According to Clean Harbors, there was a valid injunction, which the Defendants knowingly violated. The Defendants counter that (a) they did not violate the Sale Order, and (b) if they did violate it, they did so without the requisite knowl-

---

6. Federal Rule of Civil Procedure 56(c) is applicable to contested matters in bankruptcy pursuant to Bankruptcy Rules 9014 and 7056.

edge because the order was not sufficiently clear.

The first step is an examination of the injunction provisions of the Sale Order. Paragraph 9 [7] of that order reads as follows:

> Except as expressly permitted by the Agreement or this order, all persons and entities holding Encumbrances or Claims of any kind and nature with respect to the Acquired Assets are hereby enjoined from asserting, prosecuting or otherwise pursuing such Encumbrances and Claims of any kind and nature against Clean Harbors, its successors or assigns, or the Acquired Assets.

(Doc. # 4932, ¶ 9 (emphasis added)).

Paragraph 29 of the Sale Order goes on to state, in relevant part:

> All persons holding Encumbrances in or Claims against the Acquired Assets of any kind or nature whatsoever (other than persons holding Permitted Exceptions and Assumed Liabilities ) [8] shall be, and hereby are, forever barred, estopped, and permanently enjoined from asserting, prosecuting, or otherwise pursuing such Encumbrances or Claims of any kind or nature whatsoever against Clean Harbors. . . .

(Doc. # 4932, ¶ 29 (emphasis added)).

These provisions enjoin the prosecution of certain claims not otherwise permitted by the Agreement. As Paragraph 29 indicates, however, the Agreement permits the prosecution of certain Permitted Exceptions and Assumed Liabilities. The issue then is whether the obligations owing to the Defendants fall within the category of Assumed Liabilities, or more precisely, whether the obligations so clearly do not fit within Assumed Liabilities that the Defendants should be sanctioned for their actions in pursuing recovery against Clean Harbors. As such, it is necessary to examine the language of the Agreement and Sale Order, specifically, Section 1.3 of the Agreement and Paragraph O of the order.

*Assumed Liabilities*

In relevant part, Section 1.3 of the Agreement defines "Assumed Liabilities" as including:

> . . . liabilities and obligations, whether arising before or after the Closing Date, in connection with the Owned Real Property, the real property subject to Real Property Leases, the real property owned or leased, directly or indirectly, by any Transferred Sub or the operation of the Business (including liabilities and obligations arising under Environmental Laws (or other Laws) that relate to violations of Environmental Laws [) ]
> . . . .

(Doc. # 3672, Exh. A § 1.3) (emphasis added).

Paragraph O of the Sale Order further elaborates as follows:

> The liabilities assumed in paragraph 1.3 of the Acquisition Agreement specifically include the liability of the Seller and the Selling Subs with respect to the Business and the Acquired Assets for liability to a governmental entity acting under CERCLA or similar state statutes with respect to those sites set forth on Exhibit A.

(Doc. # 4932, ¶ O).

Exhibit A to the Sale Order includes the "Helen Kramer Landfill" as among the

---

7. Although the Complaint alleges that the Defendants violated the injunction in Paragraph 9, Clean Harbors' brief refers to Paragraph 29. Both provisions are discussed below.

8. Clean Harbors argues that the term "persons holding" refers to Safety–Kleen. Clean Harbors' argument on this point is unpersuasive and contrary to the plain language of the provision.

Assumed Liabilities. The Defendants represent that "[t]he Superfund Remediation Liability [currently at issue] was Safety–Kleen's *only* liability in connection with the Kramer Superfund Site ...." And, "[t]here is no other Kramer Superfund Site liability to which Paragraph O and Exhibit A could have been referring." (Adv.Doc. # 5, p. 23) (emphasis in original). Clean Harbors does not challenge this factual representation.

Clean Harbors does argue, however, that Paragraph O of the order only relates to the direct claims of the EPA or the DEP. I do not read it that way. Paragraph O speaks in terms of "liability of the Seller ... for liability to a governmental entity." (Doc. # 4932, ¶ O). Thus, Paragraph O contemplates liability owed *for* liability to a governmental entity, which is exactly the case here. Safety–Kleen owed an obligation to the Defendants for liability that the PRPs to the Settlement Agreements (including Rollins) owed to the governmental entities.

If the Sale Order only desired to have the purchaser assume liability owed directly to a governmental agency, it could have expressed it as such. In fact, in Paragraph P, the Sale Order states: "[t]he liabilities assumed in paragraph 1.3 of the Agreement specifically include the liabilities of the Seller and the Selling Subs to a governmental entity ...." (Doc. # 4932, ¶ P).

Furthermore, Paragraph O of the Sale Order does not serve to limit the scope of the Assumed Liabilities set forth in Section 1.3 of the Agreement. Paragraph O of the Sale Order simply states that the assumed liabilities "specifically include" certain environmental liabilities with reference to Exhibit A. Even if Paragraph O were read to be limited solely to liabilities to a governmental entity, the broader language in Section 1.3 of the Agreement still

stands: environmental liabilities, not limited to those asserted by environmental agencies, are assumed unless otherwise excluded.

### Excluded Liabilities

Clean Harbors argues that Section 3.8 of the Agreement applies to the instant matter to exclude the subject liabilities. Section 3.8 provides:

> *Title to Property.* Upon the entry of the Section 363/365 Order and, if applicable, the Confirmation Order, at the Closing the Seller and each of the Selling Subs will sell, assign, transfer, convey and deliver, as the case may be, to the Purchaser and the Purchasing Subs the Acquired Assets, and the Acquired Assets and the assets held by the Domestic Transferred Subs will be free and clear of all liens, claims, encumbrances and security interests other than Permitted Exceptions.

(Doc. # 3672, Exh. A, § 3.8).

According to the Agreement, the term "Excluded Liabilities" includes liabilities "which are to be discharged by the Bankruptcy Court in accordance with Section 3.8 [of the Acquisition Agreement]." (Doc. # 3672, Exh. A, Article IX) This language does not advance Clean Harbors' argument, however.

Section 3.8 of the Agreement merely represents that the Acquired Assets will be conveyed free and clear of all liens and encumbrances. The Helen Kramer Landfill was not conveyed to Clean Harbors. Safety–Kleen itself acknowledges that "the Helen Kramer Landfill was not one of the Acquired Assets...." (Adv.Doc.# 6, Exh. C, p. 13). Since the Helen Kramer Landfill was not an Acquired Asset, Section 3.8 does not apply here.

### Extrinsic Evidence and the Parol Evidence Rule

Looking beyond the Agreement and Sale Order, other evidence supports the

interpretation that Clean Harbors assumed environmental liabilities not limited to those asserted by governmental entities. Specifically, statements made at the two-day sale hearing suggest that Clean Harbors has successor liabilities beyond those to governmental entities. Clean Harbors contends that consideration of this extrinsic evidence is barred by the parol evidence rule. I do not agree.

The Agreement and the Sale Order are complex legal documents whose pervasive application is not free from debate.[9] The above discussion of the interplay among various provisions of those two documents shows that there is plenty of room for serious debate as to what liabilities Clean Harbors assumed. Consequently, it is appropriate for the Court to consider extrinsic evidence. As discussed below, comments made by parties during the sale hearing and communications among involved parties subsequent thereto, clearly show that the Defendants had a reasonable basis to believe that they have successor liability claims against Clean Harbors. That evidence is therefore appropriate for the Court's consideration.

*The Sale Hearing*

On the first day of the sale hearing, the Court heard an objection from Onyx North America Corporation ("Onyx"), a losing bidder for the business. *See* (Doc. # 4901, §§ 14–16). The Onyx objection was based, among other things, on the notion that the Onyx offer was higher and better than the Clean Harbors offer. Safety–Kleen disagreed with Onyx even though Onyx offered a higher cash/working capital component. Safety–Kleen reasoned that the Onyx offer was inferior to Clean Harbors because Clean Harbors was willing to assume more environmental liabilities.

Specifically, the testimony of Mr. Haack, an investment banker with Lazard Freres and Company, who was retained by Safety–Kleen, stated that Clean Harbors was assuming $265 million of GAAP liabilities. In explaining which liabilities this $265 million figure represented, the following exchange took place:

Q: [MR. MEEHAN, counsel for Safety–Kleen]: Now, you're familiar with the acquisition agreement with Clean Harbors, are you sir?

A: Yes, generally

Q: Generally, sir, could you explain to us what the types of liabilities are that would be assumed under that agreement as you understand it?

A: Under the agreement, Clean Harbors would be assuming a number of different categories of liabilities. First of all, they would be assuming the $265 million of GAAP liabilities that are directly related to the properties that they're acquiring.

Secondly, they would be acquiring certain potential liabilities-liabilities related to potential violations of environmental law. They would be assuming certain working capital liabilities.

Q: And among those liabilities then you indicated that would be all the closure and post closure liabilities for owned and leased sites?

A: And remediation, yes.

(Doc. # 5003, pp. 22–23 lines 22–15).

Later, Mr. Haack testified in a similar fashion explaining that "... Clean Harbors, pursuant to the agreement, is taking the contingent liabilities related to potential violations and liabilities of environmental law." (Doc. # 5003, p. 27 lines 21–25).

---

**9.** The Agreement is 69 pages long (not including exhibits) and the Sale Order is 33 pages long.

That same day, Mr. McKim, president of Clean Harbors testified as to the extent of Clean Harbors' assumption of liabilities. On cross examination the following exchange occurred:

Q: [Mr. Goroff, counsel for Onyx] Okay. And what do you ascribe to remediation?

A: (no verbal response.)

Q: First of all, what is remediation?

A: Well, there are a number of sites that were owned by the company that have been closed that need to be cleaned up, properly closed and remediated. And then there are potentially superfund sites that are associated with offsite liabilities that the company has.

Q: And how much are you assuming is going to be—how much of the 265 million is remediation expenses?

A: I don't have the breakdown here in front of me, I'm sorry.

(Doc. # 5003, p. 158 lines 13–23).

As seen through this testimony, both Safety–Kleen and Clean Harbors seemed to believe that Clean Harbors would assume the costs of the remediation expenses whether in connection with owned properties or offsite.

This understanding was reinforced on the second day of the sale hearing. On that day, this Court heard an objection from a group of creditors referred to as the Maionchi Creditors. The Maionchi Creditors had operated a business, which they sold to a predecessor in interest of Safety–Kleen. At some point after that, environmental claims were brought against the Maionchi Creditors and, as a result, they believed Safety–Kleen was liable to them for such claims. The Maionchi Creditors opposed the sale because, among other things, inadequate information had been provided to the creditors to allow them to determine what liabilities were being assumed. *See* (Doc. # 4834).

Safety–Kleen's counsel responded to this argument by saying "if this is a claim that is essentially based on damages related to environmental claims, I believe under the contract, as we discussed yesterday, there is likewise no question but that this claim has been assumed." (Doc. # 5009, p. 15 lines 15–18). In other words, in response to creditor concerns about the ambiguity of the Assumed Liabilities, Safety–Kleen responded that it believed without question that Clean Harbors had assumed the environmental claims. In response to the above described testimony and representations made at the sale hearing, Clean Harbors states:

[S]uch extrinsic evidence as the Defendants cite proves only that, at the time of the Sale Hearing to approve the Acquisition Agreement, the parties to the Acquisition Agreement made clear to the Court that the parties were not in accord as to the meaning of the words therein.

(Adv.Doc. # 8, p. 2).

Simultaneously, Clean Harbors asserts that the Acquisition Agreement is "clear and unequivocal" and not "susceptible of more than one meaning." (Adv.Doc. # 8, p. 14). Yet Clean Harbors concedes "that the Seller had a different interpretation of the words of the contract than did Clean Harbors . . . ." (Adv.Doc. # 8, p. 21).

Puzzlingly, Clean Harbors recites this fact repeatedly. In Clean Harbors' words, ". . . Clean Harbors was not in agreement with the Sellers as to the breadth of the definition of 'Assumed Liabilities' ascribed to it by the Sellers." (Adv.Doc. # 8, p. 21). And, ". . . every witness that testified acknowledged that there were unresolved 'disputes' between the parties to the Acquisition Agreement as to their respective understanding of what liabilities fell within

the definition of 'Assumed Liabilities'." (Adv.Doc. # 8, p. 15). Despite all this, Clean Harbors still asserts that there is a clear meaning in the Agreement and the Sale Order as to assumed and non-assumed environmental liabilities and that the Defendants should be held in contempt for acting on their differing interpretation.

*Affidavits and Relevant Correspondence*

Several affidavits and related documents further support the reasonableness of the Defendants' conduct in pursuing Clean Harbors in the New Jersey Court.[10] Specifically, the affidavit of Mr. Harris, the Defendants' counsel, states that after the sale closing he had communicated with Clean Harbors' outside counsel, Mr. Black, and that the following occurred:

> Mr. Black explained that Clean Harbors understood that the payment of $1,125,000 to the Kramer Group was coming due, that Clean Harbors had assumed that obligation as part of its purchase of the Chemical Services Division, and that Clean Harbors wanted to explore with Kramer Group the possibility of satisfying some, or all, of this obligation by providing environmental services to the Kramer Group in lieu of a cash payment.

(Adv.Doc. # 6, Exh. B, Exh. C, ¶ 11).

The affidavit also references a November 13, 2002 email from Mr. Black to Mr. Harris. (Adv.Doc. # 6, Exh. B, Exh. C, ¶ 12). In that email Mr. Black states that he had "spoken with top management at Clean Harbors and they are extremely interested in discussing in-kind services at the Helen Kramer site." (Adv.Doc. # 6, Exh. B, Exh. C, Exh. B). This clearly shows Clean Harbors' interest in discharging a monetary obligation by providing remedial services and obviously suggests

an acknowledgment by Clean Harbors of a liability to the Defendants.

Attached to Mr. Harris' affidavit is a letter dated March 21, 2002 from Mr. Harris to Safety–Kleen's in-house counsel, Mr. Duffie. That letter confirmed Safety–Kleen's understanding of Clean Harbors' assumption of subject liabilities as follows:

> I received today notice of the Court's approval of the sale of the old Rollins and Laidlaw businesses at auction. No schedule of "Assumed Liabilities" was attached. This is therefore to confirm our conversation a week or so ago wherein you indicated that the Kramer Landfill liabilities both to ATOFINA Chemicals, Inc. and to the Helen Kramer 0–8 Parties are Assumed Liabilities that will be transferred to Clean Harbors or any other buyer at the auction.

(Adv.Doc. # 6, Exh. B, Exh. C, Exh. A).

An affidavit of Mr. Duffie confirms the contents of the March 21, 2002. Specifically, Mr. Duffie states that he received Mr. Harris' letter and did not respond because the letter correctly confirmed Clean Harbors' obligation to the Defendants. (Adv. Doc. # 6, Exh. B, Exh. B, ¶ 9). Further, Mr. Duffie's affidavit states that when he subsequently became aware of Clean Harbors refusal to satisfy the Helen Kramer site obligations, he reminded Clean Harbors that he believed the obligations were liabilities assumed by Clean Harbors. (Adv.Doc. # 6, Exh. B, Exh. B, ¶ 14). Thus, both the Defendants and Safety–Kleen understood Clean Harbors as having assumed the liabilities. Given the language of the Agreement and Sale Order, as discussed above, it cannot be said that this view was unreasonable.

To rebut Mr. Harris' affidavit, Clean Harbors offers the affidavit of Mr. Black, its outside counsel. That affidavit ac-

---

**10.** These documents are exhibits attached to    the motion referred to in footnote 4 above.

knowledges that Mr. Black and Mr. Harris had discussions regarding in-kind services. (Doc. # 7922, Exh. H, ¶ 10). But Mr. Black's affidavit states that he did not have authority from Clean Harbors to represent Clean Harbors' position on liability and that he did not say that Clean Harbors had assumed the liability. (Doc. # 7922, Exh. H, ¶ 11). Mr. Black's affidavit does not deny liability, however. Rather, Mr. Black indicates that he reported to Clean Harbors that such obligations of "Safety–Kleen *might* not be obligations to a governmental entity under CERCLA." (Doc. # 7922, Exh. H, ¶ 10) (emphasis added). Mr. Black's affidavit does not undermine the import of Mr. Harris' affidavit and the attachment thereto.

Contrary to Clean Harbors' assertions, the language in the Agreement and Sale Order is not unambiguous on whether Clean Harbors has successor liability to the Defendants. Indeed, Clean Harbors concedes that even the parties to the Agreement had different interpretations as to the successor liability provision. Consequently, on the record before me, I conclude that no reasonable person could find that Clean Harbors could demonstrate by convincing evidence that the Agreement was not susceptible to more than one meaning as to Clean Harbors' successor liabilities.

In the future there may be legitimate debate as to whether Clean Harbors assumed the Rollins obligations; but based solely on the record at this time, this Court easily concludes that the Defendants did not act unreasonably in pursuing Clean Harbors in the New Jersey Court with respect to those obligations.

## CONCLUSION

For the foregoing reasons, I conclude that the Sale Order and the related Agreement did not give the Defendants "fair warning that [their] acts were forbidden," *United States v. Christie Indus., Inc.,* 465 F.2d at 1006, and I will therefore grant the Defendants' motion to dismiss Count III of the Complaint.