**In re SAFETY–KLEEN CORP., et al., Debtors.**

**Clean Harbors, Inc., Plaintiff/Counterclaim Defendant,**

v.

**Arkema, Inc., f/k/a Atofina Chemical, Inc., and also Elf Atochem North America, Inc., Helen Kramer Landfill Superfund Site Group, and Ballard, Spahr, Andrews & Ingersoll, LLP,[1] Defendants/Counter-claimants.**

**Bankruptcy No. 00–02303(PJW). Adversary No. 05–50474(PJW).**

United States Bankruptcy Court, D. Delaware.

Jan. 3, 2008.

---

1. Ballard Spahr Andrews & Ingersoll, LLP was dismissed as a defendant in this adversary proceeding as a result of the dismissal of Count III of Clean Harbors Adversary Complaint pursuant to the Bankruptcy Court's Order and Memorandum Opinion, each dated October 19, 2005. *See* Adv. Doc. ## 15 & 16.

See also 331 B.R. 605.

Michael R. Lastowski, Sommer L. Ross, Duane Morris LLP, Wilmington, DE, to Plaintiff.

Tobey M. Daluz, Leslie C. Heilman, Ballard Spahr Andrews & Ingersoll, LLP, Wilmington, DE, Vincent J. Marriott, III, Ballard Spahr Andrews & Ingersoll, LLP, Philadelphia, PA, to Defendants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

PETER J. WALSH, Bankruptcy Judge.

This adversary proceeding arises out of the Chapter 11 bankruptcy case of Safety–Kleen Corp. ("Safety–Kleen") pursuant to which Safety–Kleen sold one of its operating divisions to Clean Harbors, Inc. ("Clean Harbors"). Clean Harbors seeks a declaration that (i) it did not assume the Kramer Superfund Liabilities[2] with respect to the Kramer Superfund Site under the Sale Order or the Acquisition Agreement, and (ii) the Sale Order enjoins enforcement of any such liabilities against Clean Harbors. Defendants/counterclaimants seek a declaration that (i) Clean Harbors did assume the Kramer Superfund Liabilities under the Sale Order or the Acquisition Agreement, and (ii) the Sale Order does not enjoin enforcement of such liabilities against Clean Harbors.

This is an action for declaratory relief. The jurisdiction of the Court is not disputed. The statutory predicate for this matter is 28 U.S.C. § 1334. This is a core proceeding pursuant to 28 U.S.C. § 157.

The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Federal Rule of Bankruptcy Procedure 7052. To the extent any of the following findings of fact are determined to be conclusions of law, they are adopted, and shall be construed and deemed, conclusions of law. To the extent any of the following conclusions of law are determined to be findings of fact, they are adopted, and shall be construed and deemed, as findings of fact.

**2.** Capitalized terms not otherwise defined herein have the meanings ascribed to them in

## FINDINGS OF FACT

### A. Undisputed Facts

The following facts are not disputed or have been stipulated to by the parties:

1. Safety–Kleen Bridgeport, Inc. ("SK Bridgeport"), formerly Rollins Environmental Services (NJ), Inc. ("Rollins"), was a party to three consent decrees (the "Consent Decrees") and two settlement agreements (the "Settlement Agreements"), one with Defendant Arkema, Inc. ("Arkema") and one with the other Defendants (the "Site Group") with respect to superfund cleanup liabilities (collectively, the "Kramer Superfund Liabilities") at the Helen Kramer Landfill Superfund Site in Mantua, New Jersey (the "Kramer Superfund Site"). Safety–Kleen had no other liabilities with respect to the Kramer Superfund Site.

2. On June 9, 2000, Safety–Kleen and certain of its subsidiaries, including SK Bridgeport (collectively, "Safety–Kleen"), filed voluntary petitions (the "Bankruptcy Cases") for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. § 101 et seq. (as amended) (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware. The Bankruptcy Cases are jointly administered at Case No. 00–2303.

3. In late Summer/early Fall 2001, Safety–Kleen undertook to market and sell its Chemical Services Division (the "CSD"), a/k/a "Blue," which included SK Bridgeport.

4. Clean Harbors was one of the entities interested in pursuing the purchase of the CSD, and in December, 2001, executed a letter of intent and began its due diligence.

"Undisputed Facts" section below.

5. Craig Lackey was the principal in-house lawyer for Safety–Kleen responsible for managing the due diligence process with prospective purchasers and he is currently employed by Clean Harbors.

6. Virgil W. "Chip" Duffie, III was the in-house attorney for Safety–Kleen's superfund sites, including the Kramer Superfund Site and he is currently employed by the reorganized Safety–Kleen.

7. Clean Harbors engaged Jonathan R. Black, who at the time was an outside environmental lawyer, to assist Clean Harbors with due diligence in connection with its potential purchase of the CSD.

8. Mr. Black was primarily responsible for due diligence on the CSD superfund sites.

9. Clean Harbors also engaged the firm of Davis, Malm & D'Agostine ("Davis Malm") to represent Clean Harbors in negotiating the Acquisition Agreement (as hereinafter defined) with Safety–Kleen.

10. Whitton E. Norris, III is a bankruptcy lawyer with the firm of Davis Malm, and participated in certain of the negotiations with respect to the Acquisition Agreement.

11. Safety–Kleen was represented in the negotiation of the Acquisition Agreement by the firm of Skadden Arps Slate Meagher & Flom, LLP ("Skadden Arps"). Gregory St. Clair is a bankruptcy lawyer with such firm and participated in the representation of Safety–Kleen in the Bankruptcy Cases.

12. In connection with his due diligence, Mr. Black delivered to senior management of Clean Harbors, including Mr. Alan McKim, Chief Executive Officer of Clean Harbors, two reports: (i) a Preliminary Due Diligence Report, dated March 5, 2002; and (ii) a Final Due Diligence Report, dated May 2, 2002.

13. On February 22, 2002, Clean Harbors and Safety–Kleen signed an agreement of sale for the CSD (the "Acquisition Agreement").

14. Subsequent to the signing of the Acquisition Agreement, a motion was filed to approve the sale (the "Sale Motion").

15. Prior to the hearing on the Sale Motion to approve the sale, a competing bid for the CSD was submitted by Onyx North America, Inc. ("Onyx"). Onyx also filed an objection to the proposed sale to Clean Harbors.

16. The hearing to approve the Sale Motion was held on June 17 and 18, 2002 (the "Sale Hearing").

17. At or around the time of the Sale Hearing, the United States Environmental Protection Agency (the "EPA") indicated an intention to object to the sale.

18. Paragraph "O" and Exhibit "A" were added to the order approving the sale (the "Sale Order") to address the concerns of the EPA.

19. The Sale Order was entered on June 18, 2002.

20. The sale of the CSD to Clean Harbors closed in September 2002.

21. At all relevant times, Defendants Arkema and the Site Group were represented by Glenn A. Harris.

The Court conducted a two-day trial of this adversary proceeding. At the trial, Plaintiff offered the testimony of three witnesses: Whitton E. Norris, III, Jonathan R. Black and Craig Lackey. Defendant offered the testimony of two witnesses: Virgil W. "Chips" Duffie and Glenn A. Harris.

**B. Origin and Nature of Kramer Superfund Liabilities.**

1. The Kramer Superfund Site is one of the largest Superfund sites in the coun-

try, with hundreds of potentially responsible parties ("PRPs"). *See* Harris Tr. 78:13–16; 79:14–21.[3] Litigation over cleanup responsibility was commenced by the EPA seeking recovery under the Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. § 9601 *et seq.*, ("CERCLA"), and by the State of New Jersey Department of Environmental Protection simultaneously seeking recovery under CERCLA and the New Jersey Spill Compensation and Control Act, N.J.S.A. 58:10–23.11, *et seq.* (the "Spill Act") and other environmental laws (collectively, the "Kramer Landfill Litigation"). *See* Defense Exhibit ("D"-) 3 & 4/Plaintiff Exhibit ("P"-) 63 & 64; *see also* Harris Tr. 79:1–21.

2. The Kramer Landfill Litigation was originally commenced against as many as 40 "direct defendants" by either federal government or the State of New Jersey in 1989. *See* Harris Tr. 78:1–4; D–3/P–63, pp. 1–2, ¶¶ I.A.-C. Defendant Arkema was a direct defendant in the Kramer Landfill Litigation. *See* Harris Tr. 79:1–13. The Site Group consists of Arkema and certain other direct defendants, including Cytec Industries, Inc., Mobil Research & Development Corp., Chemical Lehman Tank Lines, Rohm and Haas Co., E.I. du Pont de Nemours & Co., and Crown Cork & Seal. *Id.* at 76:24–77:4. The Site Group was formed "to try to reach a global settlement of all the claims in the Helen Kramer Landfill (L)itigation," a common practice in large Superfund cases, "because the case is [otherwise] too unwieldy." *Id.* at 77:18–78:12; 78:17–25.

3. The direct defendants, including Arkema and the members of the Site Group, filed third-party complaints against hundreds of other entities for contribution under Section 113(f) of CERCLA and un-

der the Spill Act. *Id.* at 85:10–23; *see also* D–3/P–63, p. 2, ¶ D ("Certain of the Federal and State Direct Defendants brought third-party actions against a number of additional parties … seeking contribution for claims of the United States and the State under Section 113 of CERCLA."). The third-party defendants in turn were categorized into groups, including a third-party defendant generator group, a third-party defendant transporters group, and a third-party defendant municipalities group. Harris Tr. 85:25–86:3. Rollins was a third-party defendant in the generator group, *see id.* at 85:24–86:4, and asserted against Rollins were the same claims that were asserted against all of the third-party defendants:

> There were no direct claims asserted solely on behalf of Arkema against Rollins. There wasn't a claim for contractual indemnification. There wasn't any kind of separate claim.
>
> There were only the two claims, the 113(f) claim and the New Jersey's Spill Compensation and Control Act claim that were asserted by all the third-party plaintiffs against all the third-party defendants.

*Id.* at 85:10–23; 86:5–16.

4. After nearly a decade of litigation, in 1998 the Site Group was ultimately successful in reaching a settlement with the governmental entities as well as with "virtually all the claims against" the third-party defendants. *Id.* at 80:12–18.

5. The settlement with the governmental entities was embodied in the Consent Decrees, one with the United States of America and two with the State of New Jersey. *Id.* at 82:2–8; D–3–D–5/P–63–P–65. All of the settling direct defendants and all of the settling third-party defen-

---

**3.** The findings of fact set forth herein rely extensively on the trial testimony of Mr. Harris, which testimony the Court found highly credible.

dants, including Rollins, were parties to the Consent Decrees. Harris Tr. 82:8–9; D–3–D–5/P–63–P–65. In substance, the Consent Decrees provided for the reimbursement of a portion of the clean-up costs that had been incurred by the governmental entities, compensation for natural resource damages, and an agreement to assume responsibility for "operation and maintenance" of the Kramer Superfund Site. Harris Tr. 80:23–81:13; D–3–D–5/P–63–P–65.

6. Not all settling defendants had identical obligations under the Consent Decrees. Each Consent Decree contemplated two categories of settling defendants, "Settling Work Defendants" and "Settling Non–Work Defendants." Harris Tr. 82:18–83:15; *see also* D–3/P–63, pp. 6–7, ¶ I.S.-T.; p. 13, IV.3.cc. & Appendix A; D–4/P64, pp. 7–11, ¶ I.O.-U.; p. 25, IV.4. & Appendices F & H; D–5/P–65, pp. 14–15, ¶ IV.4. & Appendices E & G. The Settling Work Defendants, which consisted of the members of the Site Group, were jointly and severally liable for all obligations under the Consent Decrees, including operating and maintaining the Kramer Superfund Site. Harris Tr. 83:6–11; *see also* D–3/P–63, pp. 21–22, ¶ VII.14.a.; D–4/P–64, pp. 30–34, ¶¶ V.7.a.-e.; D–5/P–65, pp. 17–18, ¶ V.5.

7. All other settling defendants—i.e. all settling defendants other than the Site Group—were Settling Non–Work Defendants, and were severally liable under the Consent Decrees for the payment of their respective "cash-out" settlements in amounts fixed in separate agreements between the Settling Work Defendants and the Settling Non–Work Defendants. Harris Tr. 83:6–22; *see also* D–3/P–63, p. 22, ¶ VII.14.b.; D–4/P–64, p. 30, ¶¶ V.7.a.; p. 33, V.7.f.; D–5/P–65, pp. 17–18, ¶ V.5. As provided in the Consent Decree with the United States of America:

Except as specifically otherwise provided herein, the obligations of the *Settling Non–Work Defendants* under this Consent Decree *shall be limited to the payment of money to the Settling Work Defendants in the amounts and on the terms provided in their settlement agreements with the Settling Work Defendants.* Accordingly, the Settling Non–Work Defendants, who have either already paid or who are already legally obligated to pay their allocated settlement amounts to the Settling Work Defendants, shall not be subject to joint and several liability to the United States for the obligations of this Consent Decree, but shall only be severally liable for any unpaid balance on their allocated settlement amounts.

D–3/P–63, p. 22, ¶ VII.14.b; *see also* D–4/P–64, p. 33, ¶ V.7.f; D–5/P–65, pp. 17–18, ¶ V.5 (emphasis added.)

8. In exchange for being a party to the Consent Decrees and performing their respective obligations under the Consent Decrees and related settlement agreements, settling defendants, both Work and Non–Work, received a covenant not to sue from the governmental entities, and protection from additional contribution liability. Harris Tr. 83:23–84:20; *see also* D–3/P–63, pp. 22–26, ¶ VIII; pp. 27–28, ¶ X; D–4/P–64, pp. 86–92, ¶ XXII; pp. 94–96, ¶ XXIV; D–5/P65, pp. 20–24, ¶ IX; pp. 25–27, ¶ XI. The covenant not to sue, however, as well as the contribution protection, were contingent upon performance by the settling defendants of their obligations under the Consent Decrees and, in the case of Settling Non–Work Defendants, under their respective settlement agreements:

[W]hat you got . . . is you got to write a check and you knew that the government would never come after you so long as you honored your obligation on the consent decree. In this case you

paid your money under the settlement agreement.

Harris Tr. 84:16–20; *see also id.* at 84:25–85:4, 83:13–15; D–3/P63, pp. 22–23, ¶ VIII.15; D–4/P–64, pp. 86–88, ¶ XXII.67; D–5/P–65, pp. 20–21, ¶¶ IX.12a.-c.

9. Rollins was a Settling Non–Work Defendant. Harris Tr. 85:24–25; *see also* D–3/P–63, p. 42, Appendix A at p. 5; D–4/P–64, p. 109; D–5/P–65, p. 33, Appendix E at p. 3. As such, Rollins was a party to two settlement agreements. One was with Arkema (the "Arkema Settlement Agreement"), that addressed "their shares of the liability at the Kramer site ... for [a] common waste stream," the liability for which Arkema and Rollins agreed to split 50/50. *See* Harris Tr. 87:2–5, 88:9–13; *see also* D–1/P–61, pp. 2–3, §§ 2, 3. The Arkema Settlement Agreement resolved "already asserted and potential third-party claims" that each had against the other:

in the Kramer matter with respect to waste allegedly removed [Arkema's] legal predecessor Pennwalt Corporation, by Rollins or a Rollins subcontractor....

D–1/P–61, pp. 1–2.

10. The other Rollins settlement agreement was with the Site Group (the "Site Group Settlement Agreement" and with the Arkema Settlement Agreement, collectively the Settlement Agreements), and related to Rollins allocated share of liability separate from and in addition to the common waste stream covered by the Arkema Settlement Agreement. *See* D–2/P–62. Under the terms of the Site Group Settlement Agreement, Rollins had an overall settlement liability of $2 million. Of that $2 million, $875,000 was to be paid within 30 days of settlement. *See id.* at 5, § 2.1. The balance of $1,125,000 could be in the form of services or cash:

Rollins will provide at no cost to the [Site Group] up to 1.125MM in Site-related services priced at fair market value. In the event that less than the 1.125MM in services is utilized by the Primary Settling Parties within five years of the date of the execution of the Settlement Agreement any portion of the 1.125M [sic] not utilized shall be then due and payable from Rollins to the [Site Group].

*Id.* at 5, § 2.5. The agreement provided that any cash paid by Rollins to the Site Group

pursuant to this Article 2 shall be deposed [sic] in one or more trust funds established by the [Site Group] and shall be used only to pay response costs or natural resource damages to the United States or the State.

*Id.* at 5, § 2.4.

11. Sometime after approval of the Consent Decrees and execution of the Settlement Agreements, through a series of corporate transactions, Rollins became SK Bridgeport, as a result of which SK Bridgeport became party to the Consent Decrees and the Settlement Agreements, and the business and assets of SK Bridgeport, along with certain other businesses and assets, were operated by Safety–Kleen as the CSD. *See* D–29. Other than the liabilities of SK Bridgeport under the Consent Decrees and the Settlement Agreements, i.e., the Kramer Superfund Liabilities, Safety–Kleen had no other liabilities with respect to the Kramer Superfund Site.

12. In summary, as successor to SK Bridgeport, Safety–Kleen became an obligor under the two Settlement Agreements which were the product of two governmental environmental claims, namely, *United States v. Helen Kramer,* Civil Action No. 89–4340(JBS) and *State of New Jersey v. Almo Anti–Pollution Service Corp.,* Civil Action No. 89–4380(JBS). Thus, the envi-

ronmental liability identified on Exhibit A as the "Kramer Site" is the result of environmental claims of governmental agencies.

13. On behalf of Clean Harbors, Mr. Lackey testified that he "believed" that he saw "a copy of the contract between Rollins and ELF Atochem, whatever the name of the entity was at that time," and that this contract contained an agreement for Rollins to "indemnify [Arkema] for CERCLA or Superfund liability." Lackey Tr. 167:19–168:16. From this testimony, Clean Harbors argues that the liabilities which were resolved in the Settlement Agreements were contractual liabilities of the Safety–Kleen predecessors, Rollins, which were owed to Arkema. Therefore, according to Safety–Kleen these are not statutory environmental liabilities. Thus, as Clean Harbors sees it, these liabilities are not within the scope of "assumed liabilities" under the Acquisition Agreement or within the scope of any liabilities described in Paragraph O of the Sale Order. The Court rejects both the factual assertions and the legal conclusion offered by Clean Harbors on this issue.

14. With respect to the factual assertion, Clean Harbors produced no contracts or other evidence of a contractual indemnification between Arkema and Rollins. Mr. Lackey simply testified as to what he recalled seeing.[4] There is absolutely nothing in the Settlement Agreements that would suggest that they were the result of any pre-existing contractual arrangement between Rollins and Arkema and/or the settling parties in the second Settlement Agreement. Indeed, the only reference to the origin or basis of those two Settlement Agreements is the federal and state environmental actions identified above which produced the subsequent Consent Decrees. As to the nature of the claim that was asserted, Mr. Harris testified:

> There were no direct claims asserted solely on behalf of Arkema against Rollins. There wasn't a claim for contractual indemnification. There wasn't any kind of separate claim.

> There were only the two claims, the [CERCLA] 113(f) claim and the [Spill Act] claim that were asserted by all the third-party plaintiffs against all the third-party defendants.

Harris Tr. 86:5–16. As to the basis for the Arkema Settlement Agreement, Mr. Harris similarly testified:

> Q: ... [I]n drafting the settlement agreement what claim did you believe yourself to be settling?

> A: The Superfund claims, claims for the—like I just said, for the Kramer landfill, the claims that were being settled were asserted claims under 113(f) of CERCLA, which is a contribution cause of action, and contribution provisions of the New Jersey Spill Compensation and Control Act.

*Id.* at 88:14–20. The Arkema Settlement Agreement, by its express terms, is entirely consistent with Mr. Harris's testimony. The very first WHEREAS clause sets the stage:

> WHEREAS, [Arkema] is currently a named defendant ... and Rollins is currently a named third-party defendant in lawsuits pending in the United States District Court for the District of New Jersey, Dkt. Nos. 89–4340(JBS) and 89–4380(JBS), captioned *United States v. Helen Kramer et al.,* and *New Jersey v.*

---

4. The record suggests that at trial time Clean Harbors had the entire files related to the Superfund sites, including the Kramer Superfund Site. Therefore, the Court finds it strange that Clean Harbors did not introduce through Mr. Lackey the alleged contracts containing indemnification obligations so that the record on this matter would be clearer.

*Almo Anti–Pollution Service Corp. et al.* ("the Kramer matter")....

D–1/P–61, p. 1. The agreement then goes on to note that each of Arkema and Rollins had "already-asserted and potential third-party claims for indemnification, contribution, or both" against the other, and provided for the settlement on a 50/50 basis of their respective responsibility "in the Kramer matter with respect to waste allegedly removed from [Arkema's] legal predecessor Pennwalt Corporation, by Rollins or a Rollins subcontractor...." *See id.* at 1–3, second and third WHEREAS clauses & §§ 2, 3; *see also* Harris Tr. 87:2–5, 88:9–13. Nowhere is any contract referenced, nor is a 50/50 split of liability consistent with the existence of a contractual indemnity, which had it existed would have given Arkema, by Mr. Lackey's own testimony, a claim against Rollins for the entire Kramer liability for the waste stream, not merely half:

> Rollins, the way their contracts worked ... if there was ever CERCLA liability at a site, that we would indemnify the customer if we had that provision in the contract for future Superfund claims relating to the disposal of the waste....

Lackey Tr. 169:6–15. The "already asserted ... third-party claims," settled by the Arkema Settlement Agreement—i.e., the claims Arkema *in fact* asserted against Rollins—were, as such agreement itself stated, brought in the Kramer Landfill Litigation, and were, as stated by Mr. Harris, "the [CERCLA] 113(f) claim and the [Spill Act] claim that were asserted by all the third-party plaintiffs against all the third-party defendants." Harris Tr. 86:5–16. Mr. Duffie's testimony supports Mr. Harris' position: "[T]here was government intervention at every site." Duffie Tr. 57:5.

15. Even if the two Settlement Agreements were the product of contractual indemnification rights, which the Court finds they were not, they would have also arisen out of environmental liabilities to governmental agencies. The result would be the same. The Settlement Agreements obligations would still be (i) "liabilities and obligations ... that relate to violations of Environmental Laws" under the Acquisition Agreement, *see* D–13A, p. 8, § 1.3, and (ii) obligations that must be discharged under the express terms of the Consent Decrees, and hence liabilities "for" liability to a governmental entity under Paragraph O of the Sale Order. *See* D–3/P–63, p. 22, ¶ VII. 14.b.; D–4/P–64, p. 33, ¶ V. 7. f.; D–5/P–65, pp. 17–18, ¶ V.5; D–15/P–93, p. 9, ¶ O.

## C. CSD Sale Process.

16. On June 9, 2000, Safety–Kleen filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. § 101 *et seq.* (as amended) in the United States Bankruptcy Court for the District of Delaware. The Bankruptcy Cases are jointly administered at Case No. 00–02303.

17. In late Summer/early Fall 2001, Safety–Kleen undertook to market and sell the CSD. *See* Duffie Tr. 6:7–20.

18. One of Safety–Kleen's objectives in connection with the sale of the CSD was to transfer the CSD Superfund liabilities to the ultimate purchaser of the CSD business. *See id.* at 8:15–18. As characterized by Mr. Duffie, who was the in-house attorney for Safety–Kleen principally responsible for Safety–Kleen's Superfund sites, including the Kramer Site, "that was the peace of mind that we marketed." *See id.* at 9:8–9.

19. Among the interested purchasers of the CSD was Clean Harbors, which executed a letter of intent, dated as of December 13, 2002 ("Letter of Intent").

D–41. Consistent with Safety–Kleen's objective that a purchaser of the CSD assume the CSD Superfund liabilities, the Letter of Intent provided that the environmental liabilities

> to be assumed by Clean Harbors at the Closing will include ... (ii) Superfund liabilities for which the Subsidiaries [5] may be liable as a result of shipment prior to the Closing of wastes or materials *to third party operators.*

*Id.* at 3, § 3 (emphasis added).

20. As part of the due diligence Clean Harbors proceeded to conduct with respect to the CSD, Clean Harbors engaged Jonathan R. Black, who at the time was an outside environmental lawyer, to take primary responsibility for Clean Harbors's CSD Superfund liability due diligence. *See* Norris Tr. 78:15–20; Black Tr. 99:24–25, 100:19–101:1, 101:7–103:23; Duffie Tr. 10:17–21. Mr. Black had previously served as general counsel for Clean Harbors for a period of 12 years, and had extensive experience with Superfund sites and the structuring of Superfund settlements. *See* Black Tr. 100:6–9, 129:4–14.

21. The Superfund due diligence process conducted by Mr. Black on behalf of Clean Harbors was extensive, and nearly all of it was with respect to CSD Superfund liability related to third-party sites (like the Kramer Superfund Site) and not sites owned by Safety–Kleen. *See id.* at 135:14–18. Mr. Black so testified:

> Q So it's fair to say that ... nearly all [of] the due diligence you were doing related to third-party sites and not sites owned by Safety–Kleen, correct?
>
> A Yes.

*Id.* First, the process involved reviewing the responses to a comprehensive list of requested documents, provided by Mr. Black to Mr. Lackey, who was the principal in-house lawyer for Safety–Kleen responsible for managing the due diligence process with prospective purchasers. *See* D–8, p. S–K001024; Black Tr. 104:18–105:10, 135:19–23, 136:6–137:17; Lackey Tr. 157:10–22, 188:9–14, 190:6–192:12. In the sale process, Mr. Lackey was assigned the job of overseeing the collection of material related to environmental issues. He undertook the "role of handling due diligence aspects and responding to *environmental questions* since that was going to be a *key component of the transaction.*" Lackey Tr. 157:18–20 (emphasis added). Pulling all of the requested information together was described by Mr. Lackey as a formidable task:

> Q: Okay. It would[n't] [sic] have been a simple task to bring together all of the items requested in this list with respect to over 30 Superfund sites, would it?
>
> A: No, it wasn't. In fact, it was even worse than that. What I asked Chip to do, again, going back to treating all bidders equally[,] is whatever we produced in response to Clean Harbors [sic] request, we had to have a duplicate copy of for the data room. So we asked for two copies of everything. So it's this times two.

*Id.* at 192:4–12. The result, as to the Kramer Superfund Site, was that Mr. Black "felt [he] had all the operative documents, all the agreements and consent decrees." Black Tr. 130:9–10.

22. Second, Mr. Black had multiple conversations with both Mr. Duffie and Mr. Lackey regarding the CSD Superfund sites, including the Kramer Superfund Site. *Id.* at 104:25–105:3, 140:22–

---

5. "Subsidiaries" as used in the Letter of Intent were the Safety–Kleen entities that com- prised the CSD. D–41, p. 1, § 1.

141:24; Lackey Tr. 190:6–192:3; *see also* Duffie Tr. 12:8–15. Mr. Duffie, of course, testified extensively that it was his clear understanding that the CSD Superfund liabilities were being assumed by Clean Harbors. Duffie Tr. 8:12–18, 11:9–24. Mr. Lackey did not testify to a contrary understanding on his part. He ducked answering the question of the assumption of Superfund liabilities by invoking the attorney client privilege. Specifically, Mr. Lackey testified that he had no conversations on this subject with Safety–Kleen management or others in Safety–Kleen in the absence of counsel for Safety–Kleen. In other words, his only understanding of whether Clean Harbors was assuming the Superfund liabilities was on the basis of advice from counsel. Lackey Tr. 192:19–196:12. Given his heavy involvement in gathering information and documents relative to CSD's Superfund liabilities, the Court finds it difficult to believe that Mr. Lackey did not have an understanding of this subject independent of advice from counsel and particularly in light of his working closely with Mr. Duffie who did have a clear understanding of Clean Harbors' assumption of CSD's Superfund liabilities.

23. Third, Mr. Black had discussions with outside lawyers connected to the CSD Superfund liabilities, *see* Black Tr. 136:2–5, including three such discussions with lawyers involved with the Kramer Superfund Liabilities. Two were with Joel Schneider, who represented Safety–Kleen in connection with the Kramer Superfund Site, and one was with Mr. Harris, who at all relevant times represented Arkema and the Site Group. *Id.* at 139:23–140:6; Harris Tr. 112:1–13.

24. As to his conversations with Mr. Schneider, Mr. Black testified that:

I called him to find out what was going on with the site and, you know, what the current state of affairs was. I believe I called him during the January/February time frame. And then once we got into formal due diligence, I went back to him again … I had a conversation with him about the site.

Black Tr. 140:15–21.

25. Mr. Black called Mr. Harris after learning from Safety–Kleen representatives that Mr. Harris as long time counsel to Arkema was actively involved in matters related to the Kramer Superfund Site. According to Mr. Harris, Black "said to me, I'm calling because I want to do my—I'm doing due diligence on the Superfund liabilities; I understand you're the guy to talk to about the Kramer landfill; if we go through with the deal we'll be assuming the liabilities; that's why I'm calling you; now, let's talk about the liabilities and we did." Harris Tr. 112:8–13. A similar due diligence communication occurred between Mr. Norris, a lawyer for Clean Harbors, and a lawyer with Skadden Arps, who represented Safety–Kleen. Mr. Norris:

The document I am seeking is referred to in a Motion accompanying a proposed Order as Exhibit A to the proposed "Order Under 11 U.S.C. Sections 105 and 363 Authorizing Continued Payment of Superfund Obligations." However, the proposed Order enclosed with the Motion makes no mention of an Exhibit A, but does mention a "Notification" to be sent quarterly to the Lenders and the Committee, which Notification is supposed to include a "Superfund Payment Chart" to which either of them may object. The Motion clearly distinguishes between the contents of "Exhibit A to the proposed Order" and the "Superfund Payment Chart". *For due diligence purposes, and as a prospective buyer of these "liabilities", Clean Har-*

*bors would like to see both documents as soon as possible.*

D–32, pp. 1–2 (emphasis added).

26. Finally, Mr. Black was also responsible for testing the balance sheet reserves that Safety–Kleen had set for the CSD Superfund Liabilities. In so doing, Mr. Black determined that the Safety–Kleen reserves for such liabilities were $13 million, *see* Black Tr. 108:5–9, 128:9–15, including $2.1 million for the Kramer Superfund Liabilities arising from the obligations of Safety–Kleen under the Settlement Agreements, *see id.* at 151:24–152:9, and concluded "that Safety–Kleen seemed to have a reasonable basis for the reserves that they established." *Id.* at 139:12–14.

27. Mr. Black's due diligence on behalf of Clean Harbors with respect to the CSD Superfund sites began in December of 2001 and continued until late April/early May 2002. *See* Norris Tr. 78:21–79:11; Black Tr. 100:19–101:1, 130:11–14, 133:17–134:11. At no point was Mr. Black asked to stop his Superfund liabilities due diligence, including after the Acquisition Agreement was executed. *See* Black Tr. 134:18–24; D–13 A, B. As Mr. Black testified:

Q: After the agreement of sale was signed in late February—

A: Yes.

Q: —did anybody tell you stop doing due diligence, we're not taking the Superfund liabilities?

A: No, it was exactly the opposite. It was let's get going and figure out as much as-you know, let's get as much information as we can.

Black Tr. 134:18–24 (emphasis added).

28. As a result of his due diligence, Mr. Black felt he came to have an accurate understanding of the Kramer Superfund Liabilities. *See id.* at 129:15–130:10,

142:23–147:8; Duffie Tr. 12:8–14:14. He communicated this understanding to, among others, Alan McKim, Chief Executive Officer of Clean Harbors, in two comprehensive reports, a preliminary due diligence report, dated March 5, 2002 (the "Preliminary Report"), and a final due diligence report, dated May 2, 2002 (the "Final Report") addressing the CSD Superfund liabilities related to third party sites, including the Kramer Superfund Site. Black Tr. 142:8–12, 142:23–143:7; D–7, D38.

29. In the Preliminary Report, Mr. Black described the Site Group Settlement Agreement liability as follows:

(1) $875,000 cash payment; (2) $1.125 million in "inkind" [sic] site services (must be paid *in cash* if services not provided by April 2003)....

D–7, p. (BSAI) CH–0000156 (quotation marks and emphasis in original). As used in this report, Mr. Black indicated that he understood " 'inkind' site services" to mean services provided in lieu of cash:

Well, I knew there was an obligation to either pay the 1.125 million or provide services, so I think I understood that. It was an either/or....

Black Tr. 145:12–14.

30. Similarly, in the Final Report, Mr. Black described the Site Group Settlement Agreement liability as follows:

Safety–Kleen is obligated to: (1) Pay $875,000 (paid in 6/98); and (2) Provide in-kind services worth $1.125m by April, 2003 (otherwise, must be paid in cash).

D–38, p. 5, § 2.3. Again, as to the term "in-kind services," this time as used in his Final Report, Mr. Black testified as follows:

Q: In using "in kind services" in your report in [§ 2.3], you understood, did you not, that in kind services meant

services of a certain value provided instead of a cash payment; correct?

A: Well, I knew it was either—yes. Services, site services valued at 1.125[sic] or payment in cash. That was sort of a choice, I think, under that agreement.

Black Tr. 146:20–147:1.

31. On February 22, 2002, Clean Harbors and Safety–Kleen executed the Acquisition Agreement. *See* D–13A & 13B; *see also* Lackey Tr. 171:21–25. On the subject of the liabilities to be assumed by Clean Harbors in connection with the acquisition of the CSD, the Acquisition Agreement provided as follows:

*Assumed Liabilities.* On the terms and subject to the conditions set forth in this Agreement, at the Closing, the Purchaser and the Purchasing Subs shall assume from the Seller and the Selling Subs and thereafter pay, perform or otherwise discharge in accordance with their terms ... liabilities and obligations, whether arising before or after the Closing Date, in connection with ... the operation of the Business (including liabilities and obligations arising under Environmental Laws (or other Laws) [sic] that relate to violations of Environmental Laws....

D–13A, p. 8, § 1.3.

32. From this comprehensive list of assumed liabilities (the "Assumed Liabilities") a limited group of liabilities were excluded. These excluded liabilities (the "Excluded Liabilities") were defined by the Acquisition Agreement, in relevant part, to be:

[A]ny liabilities and obligations with respect to, arising out of or relating to the ownership, possession or use of the Acquired Assets and the operation of the Business prior to the Closing Date (i) which are to be discharged by the Bankruptcy Court in accordance with *Section*

*3.8* hereof, (ii) with respect to fines imposed by any Governmental Entity, (iii) with respect to injuries suffered by employees of the Seller or any Business Sub, (iv) with respect to tort (*other than environmental clean-up*) and common law claims for which post–1986 general liability insurance containing pollution exclusions normally would provide coverage, (v) which are amounts due from the Business or BSSD or (vi) which are Taxes....

*Id.* at 62, Art. IX. Definitions (emphasis added). Section 3.8 of the Acquisition Agreement, referred to in subpart (i) of such definition, in turn provided that:

*Title to Property.* Upon the entry of the Section 363/365 Order and, if applicable, the Confirmation Order, at the Closing the Seller and each of the Selling Subs will sell, assign, transfer, convey and deliver, as the case may be, to the Purchaser and the Purchasing Subs the Acquired Assets, and the Acquired Assets and the assets held by the Domestic Transferred Subs will be free and clear of all liens, claims, encumbrances and security interests other than Permitted Exceptions.

*Id.* at 20, § 3.8.

33. Subsequent to the signing of the Acquisition Agreement, the Sale Motion was filed. *See* D–30. The Sale Motion described the consideration for the acquisition of the CSD as:

an aggregate $311,270,000 which consists of (i) *the assumption of the Assumed Liabilities (as defined in Section 1.3 of the Agreement) in the estimated amount of $265,000,000;* and (ii) the payment, on the date of the consummation of the transactions contemplated by the Agreement (the "Closing Date"), of Forty–Six Million Two Hundred and

Seventy Thousand Dollars ($46,270,-000)....

*Id.* at 9, ¶ 14(a) (emphasis added).

34. Clean Harbors issued a press release on February 25, 2002 (the "Clean Harbors Press Release"), that similarly described the consideration for the acquisition of the CSD:

> Clean Harbors, Inc .... today announced that it has signed a definitive agreement to acquire the Chemical Services Division of Safety–Kleen Corp.... Under terms of the agreement, Clean Harbors will purchase the division from Safety–Kleen for $46.3 million in cash and *will assume certain environmental liabilities valued at approximately $265 million.*

D–8, p. S–K001027 (emphasis added).

35. The $265 million figure was Safety–Kleen's reserve established under generally accepted accounting principles ("GAAP") for the CSD environmental liabilities. Duffie Tr. 18:7–19:4. It included the $13 million in reserves for the CSD Superfund liabilities. *Id.* at 19:5–12. This was communicated to Clean Harbors during due diligence, *see id.* at 19:13–15, and was understood by Clean Harbors. Black Tr. 137:18–138:24.

36. Onyx filed a competing bid to the Clean Harbors bid (the "Onyx Bid"), and also filed an objection to the proposed sale to Clean Harbors (the "Onyx Objection"). D–33. The Onyx Objection asserted that the Clean Harbors bid was not higher and better than the Onyx Bid. *Id.* at 10–11, ¶¶ 14–16. The principal difference between the two offers was that the Onyx offer contemplated a higher cash/working capital component, but provided for the assumption of only a subset of the environmental liabilities. *See id.; see also* D–34, pp. 26–27. In arguing its objection, Onyx questioned whether under the Acquisition Agreement, Clean Harbors was in fact assuming all of the environmental liabilities—which was critical to an argument that Clean Harbors's offer was better, even if the cash/working capital component was less favorable, *see* D–34, p. 27, and whether, if it was, it could actually meet those liabilities. *See* D–33, pp. 5–10, ¶¶ 6–13.

37. A limited objection to the sale was also filed by Arthur G. Maionchi, Edward A. Maionchi, Thomas S. Dinette, and Charles J. Kraft on the basis that the Sale Motion fails to adequately identify, among other things, the liabilities assumed by Clean Harbors in connection with the sale of the CSD (the "Maionchi Objection"). *See* D–42; *see also* Lackey Tr. 174:11–175:9.

## D. Approval of the CSD Sale to Clean Harbors.

38. The Sale Hearing was held on June 17 and 18, 2002. *See* D–34 & 35; Lackey Tr. 171:21–25. At or around the time of the Sale Hearing, the EPA indicated an intention to object to the sale. As described by Mr. Norris:

> The Government entities ... position was, if you don't—if Clean Harbors doesn't assume all of the Superfund liability, it was no more detailed than that as I recall it, then we're going to have a problem.

Norris Tr. 37:4–9.

39. In connection with this threatened objection, Mr. Norris was presented by Gregory St. Clair, Safety–Kleen's bankruptcy lawyer, with a list of CSD Superfund sites that included 40 names, and that was proposed as a new Exhibit "A" to the order to approve the sale. *Id.* 37:10–12, 87:18–22. The Kramer Superfund Site was on the list. *See* Black Tr. 109:3–110:3. Mr. Norris faxed the list to Mr. Black, and asked Mr. Black if the list was accurate,

and what the total liabilities were with respect to the sites appearing on the list. *See* Norris Tr. 37:13–15, 37:22–38:10, 87:18–22. In asking Mr. Black to review the list and to provide him with the total Superfund liability exposure, Mr. Norris did not ask Mr. Black to distinguish between liability to a governmental entity and any other kind of liability. Black Tr. 127:19–128:8. Mr. Norris said that he "wasn't focused on the distinction between liabilities to governmental entities and liabilities to, you know, non-governmental entities. That wasn't the issue of that particular moment. The question was what's the amount." Norris Tr. 98:19–23.

40. Mr. Black suggested that four sites be removed from the list. *Id.* at 38:3–5. The Kramer Superfund Site was not one of those that Mr. Black suggested be removed. Black Tr. 109:21–24. Mr. Black also advised Mr. Norris that the total liability for the remaining 36 sites on the list was $13 million. *Id.* at 128:9–15. This number included the reserves for the Kramer Superfund Liabilities of $2.1 million, which number was based upon the amounts specified under the Settlement Agreements and not on any sort of government "re-opener" liability. *Id.* at 128:16–129:3. Mr. Black was clear on this:

Q And the Kramer site reserves were not built around [governmental] reopener liability, were they?

A The reserves were built around the private—the Safety–Kleen reserves were built around the private party agreements.

Q In other words, the Kramer reserves included in the $13 million number that you gave to Mr. Norris reflected the liability of Safety–Kleen under the agreements with the Kramer site group, what you referred to earlier as the zero to eight group, and what's now Arkema, correct?

A Yes, I believe that's correct.

*Id.* at 128:19–129:3. Mr. Norris testified that he conveyed the 36 sites and the $13 million figure to Mr. McKim:

I reported to Mr. McKim. He said, "Tell them yes." He said, "It's not enough money to get them angry with us."

Norris Tr. 38:19.

41. As a result of Mr. Norris's discussions with Mr. Black, a revised Exhibit "A" was prepared that deleted the four sites referenced by Mr. Black, *see id.* at 42:7–10, and Exhibit "A" as so revised and a new Paragraph "O" were added to the form of order approving the sale that was actually entered by the Court to address the concerns of the EPA. *See id.* at 41:14–42:10; D–15, P93. Paragraph "O" of the Sale Order reads as follows:

The liabilities assumed in paragraph 1.3 of the Acquisition Agreement specifically include the liability of the Seller and the Selling Subs with respect to the Business and the Acquired Assets for liability to a governmental entity acting under CERCLA or similar state statutes with respect to those sites set forth on Exhibit A.

D–15/P–93, p. 9, ¶ O; *see also* D–15/P–93, Exhibit "A"; P–101.

42. In presenting the Sale Order to the Court at the beginning of the Sale Hearing, Mr. St. Clair had the following exchange with the Court:

MR. ST. CLAIR: The language in Paragraph O provides that the liabilities assumed in Paragraph 1.3 of the acquisition agreement specifically include the liabilities of the seller and the selling subs with respect to the business and the acquired assets for liability to a governmental entity acting under [CERCLA] or similar State Statutes with re-

spect to the sites that are listed on the new Exhibit A to the proposed order.

And those are, Your Honor, all of our known Superfund sites. . . .

\* \* \*

THE COURT: Okay, so basically—I guess this maybe is broader language than is in the agreement. There's no time limitation attached to it. *Whatever liability the seller has with respect to these properties arising out of Federal or State environmental regulations are being assumed.*

MR. ST. CLAIR: *That's correct, Your Honor.* And we don't believe this is any broader than the assumed—assumption language in the contract. *We think this is just a clarification.*

D–34, pp. 14–15 (emphasis added). Mr. Norris was present in the courtroom during this dialogue with the Court and said nothing. *See id.* at 2, 14–15; *see also* Norris Tr. 35:3–8, 55:2–7.

43. The Sale Order also contained language that excluded from certain injunctive provisions thereof the enforcement rights of the holders of Assumed Liabilities, and conferred the benefit of the Sale Order and the Acquisition Agreement on creditors of Safety–Kleen, including the holders of Assumed Liabilities. Paragraph 9 of the Sale Order provided that:

*Except as expressly permitted by the Agreement or this order,* all persons and entities holding Encumbrances or Claims of any kind and nature with respect to the Acquired Assets are hereby enjoined from asserting, prosecuting or otherwise pursuing such Encumbrances and Claims of any kind and nature against Clean Harbors, its successors or assigns, or the Acquired Assets.

D–15/P–93, p. 18, ¶ 9 (emphasis added). In turn, Paragraph 29 of the Sale Order provided, in part, that:

*Other than* the Permitted Exceptions and *the Assumed Liabilities,* the sale, transfer, assignment and delivery of the Acquired Assets shall not be subject to any Encumbrances or Claims. . . .

\* \* \*

All persons holding Encumbrances in or Claims against the Acquired Assets of any kind or nature whatsoever (*other than persons holding Permitted Exceptions and Assumed Liabilities*) shall be, and hereby are, forever barred, estopped, and permanently enjoined from asserting, prosecuting, or otherwise pursuing such Encumbrances or Claims of any kind or nature whatsoever against Clean Harbors . . . .

*Id.* at 26–27, ¶ 29 (emphasis added). Finally, Paragraph 36 of the Sale Order, in relevant part, stated that:

The terms and provisions of the Agreement and this Order shall be binding in all respects upon, *and shall inure to the benefit of,* the Debtors, their estate [sic], and *their creditors* and interest holders, Clean Harbors, and their respective affiliates, successors and assigns, *and any affected third parties* including, but not limited to, all persons asserting a Claim against or Encumbrance in the Acquired Assets to be sold to Clean Harbors pursuant to the Agreement. . . .

*Id.* at 29–30, ¶ 36 (emphasis added).

44. Much of the testimony on the first day of the Sale Hearing related to the Onyx Objection. Mr. McKim, on cross-examination by counsel for Onyx, specifically testified at the Sale Hearing that Clean Harbors was assuming the $265 million in GAAP environmental liabilities that had first been publicly identified in the Sale Motion and the Clean Harbors Press Release, including the Superfund remediation liabilities:

Q [MR. GOROFF, counsel for Onyx]: When Clean Harbors has made public announcements of the liabilities it's assuming, what number is it using?

A: Approximately $265 million.

\* \* \*

Q: *And what do you ascribe to remediation? ... First of all, what is remediation?*

A: *Well, there are a number sites that were owned by the company that have been closed that need to be cleaned up, properly closed and remediated. And then there are potentially Superfund sites that are associated with offsite liabilities that the company has.*

Q: And how much are you assuming is going to be—how much of the 265 million is remediation expenses?

A: I don't have the breakdown here in front of me, I'm sorry.

D–34, pp. 143, 158 (emphasis added).

45. Similarly, Mr. Norris, in proffering the direct testimony of Mr. McKim, also repeated the assumption of the $265 million in GAAP environmental liabilities, and stated that "while there's no universal agreement on every single point ... there is generally no disagreement on what types of liabilities we are assuming." *See id.* at 139–40; *see also* Norris Tr. 59:18–60:22.

46. Finally, Mr. Thomas Haack of Lazard Freres and Company, Safety–Kleen's investment bankers, testified that:

[W]hen we look at the environmental liabilities and the litigation considerations, the Clean Harbors bid assumes that they will take the full $265 million of GAAP liabilities. Whereas Onyx is not taking all of those.... Secondly, Clean Harbors, pursuant to the agreement, is taking the contingent liabilities related to potential violations and liabilities of environmental law. Onyx is assuming only a very limited immaterial amount of contingent liabilities.

D–34, pp. 22, 27.

47. The testimony and argument on the first day of the Sale Hearing was sufficient to persuade the Court to overrule the Onyx Objection:

First of all, the—there was a presentation by Lazard showing the comparable proposals, one by Clean Harbors the other by Onyx combined. And I think that that two- or three-page analysis demonstrated unequivocally that as Lazard developed the information the Clean Harbors deal is much better. If you just take the simple proposition that the liabilities being assumed are 365[sic] by Clean Harbors, but only 70 by Onyx, then there's a negative $195 million gap. And that one factor alone would demonstrate that the Clean Harbors deal is better.

*Id.* at 221–22.

48. In a similar vein, on the second day of the Sale Hearing, the Court overruled the Maionchi Objection, and in so doing expressed the Court's understanding of the transaction evidenced by the Acquisition Agreement as it related to the assumption of environmental liabilities:

[A]s Mr. Baker [counsel for Safety–Kleen] has pointed out, if it's a contract claim, you'll be treated like any other unsecured creditor here. *If it's an environmental claim, then likely you will have a claim against Clean Harbors. And it strikes me that that's good for you and not bad for you because obviously Clean Harbors is a financially viable entity.*

D–35, p. 19 (emphasis added).

49. The Sale Order was entered on June 18, 2002. D–15/P–93. After the Sale Hearing and before the closing under the

Acquisition Agreement, counsel for Safety–Kleen and Mr. Norris undertook to resolve certain disputes that existed in connection with the liabilities to be assumed by Clean Harbors and began the process with a schedule of CSD environmental liabilities that had originally been provided to Onyx, and that reflected Safety–Kleen's understanding of what CSD environmental liabilities had been assumed by Clean Harbors. Norris Tr. 33:22–34:25, 81:14–82:9; *see also* D–21, pp. SK–000172–181. That schedule listed the Kramer Superfund Liabilities as Assumed Liabilities. *See* D–21, p. SK–000179. Mr. Norris, with the assistance of Mr. Black annotated the schedule to reflect liabilities that they believed were not Assumed Liabilities. *See* Norris Tr. 34:17–25, 96:20–22; *see also* D–20 & 21. The Kramer Superfund Liabilities were not highlighted as being among the liabilities that Clean Harbors asserted it was not assuming. *See* D–21, p. SK–000179. *See also* Norris, Tr. 85:24–86:11.

### E. Post–Closing Events.

50. The sale of the CSD to Clean Harbors closed in September, 2002. After the sale transaction closed, Mr. Duffie caused to be delivered to Clean Harbors all of Safety–Kleen's files with respect to the Superfund sites. Clean Harbors did not return those materials to Safety–Kleen. Duffie Tr. 21:21–22:5. If Clean Harbors did not assume the liabilities to which those materials related why would they keep them? To ask that question is to answer it.

51. After the closing, Mr. Black telephoned Mr. Harris to explore with Mr. Harris the provision of services by Clean Harbors in lieu of the $1.125 million cash payment coming due under the Site Group Settlement Agreement in April of 2003. *See* Black Tr. 119:21–24, 121:9–122:6,

147:15–148:6; Duffie Tr. 26:24–27:25; Harris Tr. 92:22–93:17.

52. Mr. Black was specific in acknowledging the liability of Clean Harbors under the Site Group Settlement Agreement, and about seeking to address those liabilities through the provision of in-kind services at the Kramer Superfund Site. *See* Harris Tr. 92:22–94:5.

53. Subsequent to his conversation with Mr. Harris, Mr. Black sent an email to Mr. Harris which repeated his proposal to provide in-kind services at the Kramer Superfund Site, and indicated that he had the approval of top management to discuss those services with Mr. Harris:

> I have spoken with top management at Clean Harbors and they are extremely interested in discussing in-kind services at the Helen Kramer site. Clean Harbors would prefer to offer the services over an extended period of time at the site and this may be attractive to the group members.

D–17/P–26, p. KG–00357. "Top management" included Mr. McKim. Black Tr. 148:7–149:3.

54. Mr. Black has denied that he acknowledged Clean Harbors's liability to Mr. Harris, and testified that he used the phrase "in-kind" services in his conversations with Mr. Harris and in his follow-up email only to "ring a bell" for Mr. Harris and as a "descriptor." *See id.* at 149:15–151:2. That testimony is difficult to believe. His denial is inconsistent with both Mr. Harris's testimony and with the sense in which Mr. Black himself had used "in kind" services when describing precisely the same liability in his own due diligence reports—i.e. as the provision of services in lieu of payment of a cash obligation. *See* D–7, p. (BSAI) CH–0000156 and related testimony at Black Tr. 145:8–14; *and* D–38, p. 5, § 2.3 and related testimony at Black Tr. 146:20–147:1.

55. Clean Harbors' proposal was not of interest to the Site Group, and after Mr. Harris communicated this to Mr. Black, Mr. Black made an alternative proposal under which in-kind services would be provided to the individual members of the Site Group, rather than at the Kramer Superfund Site itself. Harris Tr. 96:1–97:4. This was also not of interest to the Site Group. This was communicated to Mr. Black by Mr. Harris as well. *Id.* at 97:5–18.

56. Mr. Lackey, after the acquisition of the CSD, went to work for Clean Harbors as in-house environmental counsel, and assisted in the preparation of the 2002 audited financial statements. *See* Lackey Tr. 156:7–10; 184:5–185:1. Mr. Lackey testified that he provided to Clean Harbors's then-auditors, Price Waterhouse Coopers, a legal database of environmental liabilities of Clean Harbors. *See id.* at 184:17–23. That legal database included the Kramer Superfund Liabilities. *See id.* at 184:24–185:8. Also, Mr. Lackey acknowledged that Clean Harbors' Form 10K filing with the SEC for the year ended December 31, 2002 reflects that "all of the sites on Exhibit A to the sale order are being referred to under Assumption of Certain CSD Superfund Liabilities on page 28 of the 10K." *Id.* at 184:1–3; D–11, p. 28.

57. Similarly, Mr. Duffie, who has remained responsible for reorganized Safety–Kleen's remaining environmental liabilities, *see* Duffie Tr. 28:1–4, when discussing Safety–Kleen's Superfund liabilities with Safety–Kleen's auditors, has used his own chart which reflects the Kramer Superfund Liabilities as the obligation of Clean Harbors. *See id.* at 29:1–22; D–37, p. 2.

58. On April 28, 2003 Mr. Norris advised Mr. Harris in writing that Clean Harbors was taking the position that it had no liability with respect to the Kramer Superfund Site. P–30. Mr. Norris copied that letter to Mr. Black. On April 30, 2003 Mr. Black forwarded a copy of that letter to Mr. Duffie. P–84. Mr. Duffie was surprised at Clean Harbors position. Duffie Tr. 22:12–18. Mr. Duffie's surprise is reflected in a April 30, 2003 e-mail to Mr. Lackey: "Damn Craig, that was your baby when the deal was cut. Probably not gonna win either company any friends on this one. This was on the list of SF sites, on the 265 list and clearly part of due diligence. I am really surprised you guys are chunking." D–36.

## CONCLUSIONS OF LAW

**I. The Kramer Superfund Liabilities Are Assumed Liabilities Under The Sale Order And The Acquisition Agreement.**

**A. Under the Plain Language of the Sale Order and the Acquisition Agreement, the Kramer Superfund Liabilities are Assumed Liabilities.**

1. In the absence of ambiguity, the plain language of a contract controls its interpretation. *See, e.g., Chambers v. Genesee & Wyo. Inc.,* No. 354, 2005 WL 2000765, *5, 2005 Del. Ch. LEXIS 118, *16 (Del. Ch. Aug. 11, 2005) ("[W]here ... the task before the court is the interpretation of contractual language, ... [i]f that language is unambiguous, its plain meaning alone dictates the outcome.") (footnote omitted); *see also Haft v. Dart Group Corp.,* 841 F.Supp. 549, 564 (D.Del.1993), *aff'd,* 1996 U.S.App. LEXIS 15008 (3d Cir. 1996) ("[C]ourts are to read the contract as a whole and give its provisions their ordinary meaning."); *Ed Fine Oldsmobile, Inc. v. Diamond State Tel. Co.,* 494 A.2d 636, 637–38 (Del.1985) ("[O]ur task is to interpret a contract and give its clear, unambiguous provisions their intended effect.").

■ 2. A contract is not ambiguous simply because the parties assert different meanings for a contractual provision. *See, e.g., MW Post Portfolio Fund Ltd. v. Norwest Bank Minn., N.A. (In re Onco Inv. Co.),* 316 B.R. 163, 167 (Bankr.D.Del.2004); *MHM/LLC, Inc. v. Horizon Mental Health Mgmt., Inc.,* No. 14465, 1996 WL 592719, *2, 1996 Del. Ch. LEXIS 129, *6 (Del. Ch. Oct. 3, 1996), *aff'd,* 694 A.2d 844 (Del.1997).

■ 3. The Sale Order and the Acquisition Agreement are clear and unambiguous and, therefore, the plain language of both such documents controls. Paragraph O of the Sale Order provides that:

> The liabilities assumed in paragraph 1.3 of the Acquisition Agreement specifically include the *liability of the Seller and the Selling Subs with respect to the Business* and the Acquired Assets *for liability to a governmental entity* acting under CERCLA or similar state statutes with respect to those sites set forth on Exhibit A.

*See* D–15/P–93, p. 9, ¶ O (emphasis added). Note what this provision does not say. It does not say liabilities "with respect to the Acquired Assets." It is with respect to both the Business and the Acquired Assets. Exhibit "A" specifically lists the Kramer Superfund Site. *See* D–15/P–93, Exhibit "A"; P–101. The Consent Decrees by their terms are liabilities to governmental entities to which SK Bridgeport became a party. The Settlement Agreements quantified those liabilities to the governmental entities and, in addition, as to Arkema and the Site Group, were liabilities of SK Bridgeport "for" the Consent Decree liabilities. Accordingly, under the plain language of the Sale Order, the Kramer Superfund Liabilities are "specifically" Assumed Liabilities under the Acquisition Agreement. *See Clean Harbors, Inc. v. Arkema, Inc. (In re Safety–Kleen),*

331 B.R. 605, 609–10 (Bankr.D.Del.2005) (emphasis in original):

> Paragraph O contemplates liability *for* liability to a governmental entity, which is exactly the case here. Safety Kleen owed an obligation to the Defendants for liability that the PRPs to the Settlement Agreements (including Rollins) owed to the governmental entities.

4. The Kramer Superfund Liabilities are also Assumed Liabilities under the plain language of the Acquisition Agreement. In relevant part, Section 1.3 of the Acquisition Agreement defines "Assumed Liabilities" as including, among other things:

> *liabilities and obligations,* whether arising before or after the Closing Date, in connection with . . . the operation of the Business (including liabilities and obligations *arising under Environmental Laws (or other Laws) that relate to violations of Environmental Laws* . . . .

*See* D–13A, p. 8, § 1.3 (emphasis added). The Consent Decrees and the Settlement Agreements evidence obligations arising under CERCLA and the Spill Act, and settle direct and third-party claims arising under or with respect to such statutes. As such, they are "liabilities and obligations . . . arising under Environmental Laws (or other Laws) that relate to violations of Environmental Laws . . . ." *Id.*

■ 5. In the eleventh hour of the contract negotiations Mr. Norris suggested a change to Section 1.3 of the Acquisition Agreement. According to Mr. Norris he intended to modify the scope of "assumed liabilities" under Section 1.3 of the Acquisition Agreement so as to limit them to only those that would survive a sale free and clear of liens—and specifically to exclude "environmental liabilities related to sites owed by third-parties" Norris Tr. 25:20–26:2; D–13A, p. 62 and pp. 8–9, Section

1.3. Mr. Norris' contribution to the definition of excluded liabilities was subsection (i) of the definition which was to cross reference to Section 3.8 of the Acquisition Agreement, a provision that dealt with the state of title of the assets to be acquired. Norris Tr. 29:24–30:2; *see* D–13A, p. 62, p. 20, Section 3.8. However, Section 3.8 was, as Mr. Norris himself testified, a "provision [that] was in the [Acquisition Agreement] from the start." Norris Tr. 32:15–16. Hence, that section had not theretofore been understood by either party to limit assumed liabilities to only those that would survive a sale free and clear of liens. Mr. Norris testified that the issues driving that eleventh hour negotiations were "working capital issues," *Id.* at 26:6–8, 27:15–18, and "Excluded Liabilities" language was not even discussed. *Id.* at 27:18–19. That Mr. Norris was intending, merely by adding a second reference to a provision already in the Acquisition Agreement to expand the effect of that provision to now limit assumed liabilities in such a fashion was, at best, in the words of Mr. Norris himself, "deliberately vague." *Id.* at 33:7. The Court declines to accept as helpful to the interpretation of a contract, a provision that is characterized by the author of that provision as "deliberately vague." In any event, as detailed in the above findings, the behavior of Clean Harbors during the due diligence period and thereafter conclusively demonstrates that not even Clean Harbors believed that the definition of "Excluded Liabilities" had the limiting effect now argued for by Clean Harbors, nor does the Acquisition Agreement's plain language support such an interpretation.

6. The existence of exceptions to Assumed Liabilities—Excluded Liabilities—does not change the result. Environmental liabilities are specifically listed as Assumed Liabilities. Such liabilities are nowhere mentioned in the definition of Excluded Liabilities, except to carve them out from an otherwise generic enumeration of certain excluded insured tort liabilities. Nor is the cross-referenced Section 3.8 of the Agreement of Sale applicable to the Kramer Superfund Liabilities, as it relates to the state of title to Acquired Assets, and the Kramer Superfund Site was not an Acquired Asset:

> Section 3.8 of the Agreement merely represents that the Acquired Assets will be conveyed free and clear of all liens and encumbrances. The Helen Kramer Landfill was not conveyed to Clean Harbors.... Since the Helen Kramer Landfill was not an Acquired Asset, Section 3.8 does not apply here.

*Clean Harbors,* 331 B.R. at 610–11. Moreover, the Sale Order excluded Assumed Liabilities from whatever effect Section 3.8 might otherwise have had:

> *Other than* the Permitted Exceptions and the *Assumed Liabilities,* the sale, transfer, assignment and delivery of the Acquired Assets shall not be subject to any Encumbrances or Claims....

D–15/P–93, pp. 26–27, ¶ 29 (emphasis added).

█ 7. Even if there was inconsistency among the Sale Order, the list of Assumed Liabilities in Section 1.3, the definition of Excluded Liabilities, and the language of Section 3.8, the more specific language in the Sale Order and Section 1.3 that expressly includes environmental liabilities would control. *See, e.g., Ins. Comm'r of Pa. v. PRS Ins. Group, Inc. (In re PRS Ins. Group, Inc.),* Adv. No. 02–1977, 2003 WL 21262446, *2, 2003 Bankr.LEXIS 748, *7 (Bankr.D.Del. May 30, 2003) ("As a general rule of contract interpretation, when a document contains both general and specific provisions relating to the same subject, the specific provision controls.") (citation omitted); *see also, Conley v.*

*Dan–Webforming Int'l A/S, Ltd.*, No. 91–401, 1992 WL 401628, *8, 1992 U.S. Dist. LEXIS 20251, *27 (D.Del. Dec. 29, 1992) ("where a contract contains inconsistent terms, the specific term qualifies the general"); *New Castle–Gunning Bedford Educ. Ass'n v. Bd. of Educ.*, 421 F.Supp. 960, 964 (D.Del.1976).

### B. Even if the Acquisition Agreement and the Sale Order were Ambiguous, the Record Demonstrates that the Intent of the Parties was that the Kramer Superfund Liabilities were Assumed Liabilities.

■ 8. If an agreement is ambiguous, courts may resort to extrinsic evidence to determine the meaning of the contract. *See, e.g., Quintus Corp. v. Avaya, Inc. (In re Quintus Corp.)*, 353 B.R. 77, 82 (Bankr. D.Del.2006). This extrinsic evidence " 'may include the structure of the contract, the bargaining history, and the conduct of the parties that reflects their understanding of the contract's meaning.' " *Bethlehem Steel Corp. v. United States*, 270 F.3d 135, 139 (3d Cir.2001) (quoting *Teamsters Indus. Employees Welfare Fund v. Rolls–Royce Motor Cars, Inc.*, 989 F.2d 132, 135 (3d Cir.1993)); *see also Eagle Indus., Inc. v. DeVilbiss Health Care, Inc.*, 702 A.2d 1228, 1233 (Del.1997) ("In construing an ambiguous contractual provision, a court may consider evidence of prior agreements and communications of the parties as well as trade usage or course of dealing") (footnote omitted).

■ 9. Of these areas of inquiry, particular importance is often placed on the conduct of the parties. *See Artesian Water Co. v. Delaware*, 330 A.2d 441, 443 (Del.1974) ("Courts of this State have long looked to relevant facts and circumstances surrounding the contract, including the actions of the parties, in ascertaining the

intention of the parties.... Such actions are of great weight in determining the meaning and applicability of the contract, and lead the Court to a presumptively correct interpretation.") (citations omitted); *Bd. of Educ. v. Appoquinimink Educ. Ass'n*, No. 16812, 1999 WL 826492, *8, 1999 Del. Ch. LEXIS 188, *24 (Del. Ch. Oct. 6, 1999) ("When interpreting an ambiguous contract, the parties' prior conduct under the agreement is an important source of evidence to which the court should turn.").

■ 10. The extrinsic evidence in the record compels an interpretation of the Sale Order and the Acquisition Agreement that includes the Kramer Superfund Liabilities as Assumed Liabilities. In summary:

· The Letter of Intent specifically indicated that the CSD Superfund liabilities would be assumed by Clean Harbors if it purchased the CSD.

· Mr. Black indicated to Mr. Harris during due diligence that if Clean Harbors purchased the CSD, it would be assuming CSD Superfund liabilities. Mr. Norris made a similar statement in email communication with counsel for Safety–Kleen.

· After the Acquisition Agreement was signed, Mr. Black conducted further months of intensive due diligence with respect to the Superfund liabilities, including a complete document review of the Kramer Superfund Liabilities and conversations with Mr. Duffie, Mr. Lackey, and outside counsel about the Kramer Superfund Liabilities. Mr. Black reported his findings in detailed and comprehensive reports to, among others, Mr. McKim, the chief executive of Clean Harbors, and these reports reflected a clear description of the Kramer Superfund Liabilities. It is incomprehensible to this Court how

Clean Harbors can take the position that it has no liability for the Kramer Superfund Site claims when it authorized and accepted Mr. Black's comprehensive investigation of the Superfund liabilities, including the Kramer Superfund Site. Why would Clean Harbors undertake that effort if those liabilities were not being assumed? To ask that question is to answer it

· On the day of the Sale Hearing, Clean Harbors agreed to a new Paragraph O to the Sale Order and related Exhibit "A" that emphasized that the CSD Superfund liabilities were being assumed, (i) even though the EPA demand related to assumption of "all of the Superfund liability" (ii) without inquiring of Mr. Black which sites involved "direct" obligations to a governmental entity and which involved third-party settlement agreements, and (iii) based upon a $13 million exposure that constituted the total liability for the CSD Superfund sites, including the third-party settlement agreement liability at the Kramer Superfund Site, not a subset of that liability limited to re-opener liability or other "direct" governmental obligations.

· New Paragraph O and Exhibit "A" of the Sale Order were explained to the Court at the Sale Hearing as a "clarification" by counsel for Safety–Kleen, not as a new component of the sale transaction. Clean Harbors did not dispute this characterization.

· Also at the Sale Hearing, both Mr. Norris and Mr. McKim acknowledged that Clean Harbors was assuming $265 million in CSD environmental liabilities, a number that included the CSD Superfund liability reserves.

· After the Sale Hearing, counsel for Safety–Kleen provided to Mr. Norris a chart that reflected Safety–Kleen's belief that the Kramer Superfund Liabilities and certain other liabilities were Assumed Liabilities. Mr. Norris, after consultation with Mr. Black, returned that chart, and while disputing some of the liabilities reflected on that chart, did not dispute the designation of the Kramer Superfund Liabilities as Assumed Liabilities.

· After closing under the Acquisition Agreement, Mr. Black called Mr. Harris and acknowledged the liability of Clean Harbors under the Site Group Settlement Agreement by attempting to negotiate a method of meeting that liability through various types of in-kind service arrangements.

· In connection with the preparation of Clean Harbors's 2002 audited financial statements, Clean Harbors's auditors were provided by Clean Harbors with a list of environmental liabilities of Clean Harbors that included the Kramer Superfund Liabilities. In its Form 10K for 2002 Clean Harbors references the sites listed on Exhibit A as Liabilities Assumed by Clean Harbors as part of the purchase of the CSD.

· In consistent fashion, reorganized Safety–Kleen, in reporting environmental liabilities to its auditors, reflected the Kramer Superfund Liabilities as having been assumed by Clean Harbors.

## II. As Assumed Liabilities, the Kramer Superfund Liabilities Can Be Enforced by the Kramer Defendants Directly Against Clean Harbors.

### A. Clean Harbors is Directly Liable to the Kramer Defendants for the Assumed Liabilities.

■ 11. At common law, the doctrine of successor liability provides that "where one corporation sells or transfers all or a substantial part of its assets to another, the transferee does not become liable for

the debts and liabilities, including torts, of the transferor." *Brzozowski v. Correctional Physician Servs., Inc.*, 360 F.3d 173, 177 (3d Cir.2004).

■ 12. However, "[a] purchaser may be liable where it expressly assumes liability . . . ." *Id. See also Rosener v. Majestic Mgmt., Inc. (In re OODC, LLC)*, 321 B.R. 128, 135–37 (Bankr.D.Del.2005) (finding that the trustee had standing to assert claims belonging to the unsecured creditors of the selling companies against the debtor, because, among other things, the debtor expressly assumed the liabilities of the selling companies in the asset purchase agreements and therefore the selling companies' creditors were creditors of the debtor); *Nat'l Pipe & Plastics, Inc. v. N.P.P. Liquidation Co. (In re Nat'l Pipe & Plastics, Inc.)*, Adv. No. A–99–12, 2000 WL 33712292, *6, 2000 Bankr.LEXIS 1329, *18 (Bankr.D.Del. Sept.25, 2000) (stating that a purchaser of assets will directly take on liabilities of the seller, notwithstanding the general rule against successor liability, if "the purchaser expressly or impliedly assumes such liabilities").

■ 13. When a buyer expressly assumes liabilities of a seller, it becomes directly liable therefore, regardless of any language in the sale agreement otherwise purporting generally to disclaim third-party beneficiary rights. *See Rosener,* 321 B.R. at 135–36. Moreover, the Sale Order expressly conferred third-party beneficiary rights on interested parties, including the creditors of Safety–Kleen:

> The terms and provisions of the Agreement and this Order shall be binding in all respects upon, *and shall inure to the benefit of,* the Debtors, their estate [sic], and *their creditors* and interest holders, Clean Harbors, and their respective affiliates, successors and assigns, *and any affected third parties* including, but not

limited to, all persons asserting a Claim against or Encumbrance in the Acquired Assets to be sold to Clean Harbors pursuant to the Agreement. . . .

D–15/P–93, pp. 29–30, ¶ 36 (emphasis added).

■ 14. As Clean Harbors expressly assumed the Assumed Liabilities under the Sale Order and the Acquisition Agreement, including the Kramer Superfund Liabilities, Arkema and the Site Group may assert those liabilities directly against Clean Harbors.

**B. The Sale Order Injunction Does Not Bar Enforcement of the Assumed Liabilities Against Clean Harbors.**

■ 15. Under the Sale Order, Assumed Liabilities are not subject to the injunction in the Sale Order prohibiting enforcement against Clean Harbors of claims originally against Safety–Kleen. *See id.* at 18, 26–27, ¶¶ 9, 29.

16. As provided in Paragraph 29 of the Sale Order:

> All persons holding Encumbrances in or Claims against the Acquired Assets of any kind or nature whatsoever (*other than persons holding Permitted Exceptions and Assumed Liabilities*) shall be, and hereby are, forever barred, estopped, and permanently enjoined from asserting, prosecuting, or otherwise pursuing such Encumbrances or Claims of any kind or nature whatsoever against Clean Harbors . . . .

*Id.* at 26–27, ¶ 29 (emphasis added). *See also Clean Harbors,* 331 B.R. at 609 (Paragraph 29 of the Sale Order "permits the prosecution of . . . Assumed Liabilities.")

17. Accordingly, the injunction provisions of the Sale Order do not enjoin the enforcement of the Kramer Superfund Li-

abilities by Arkema and the Site Group against Clean Harbors.

## CONCLUSION

For the reasons set forth above, I will grant judgment in favor of Defendants because the Kramer Superfund Liabilities are Assumed Liabilities under the Acquisition Agreement and the Sale Order and therefore Clean Harbors is liable to Arkema and the Site Group for payment of the assumed liabilities in accordance with their terms, and the Sale Order does not enjoin enforcement by Arkema and the Site Group of the Kramer Landfill Liabilities against Clean Harbors in a manner provided in and permitted by the Settlement Agreements.