

2009 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

2-24-2009

# Saudi Amer Bank v. Shaw Grp Inc

Precedential or Non-Precedential: Precedential

Docket No. 05-2717

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2009

Recommended Citation

"Saudi Amer Bank v. Shaw Grp Inc" (2009). *2009 Decisions*. Paper 1797.
http://digitalcommons.law.villanova.edu/thirdcircuit_2009/1797

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2009 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

Nos. 05-2717 & 07-1772
_____

IN RE: STONE & WEBSTER, INCORPORATED, ET AL.,
Debtors

SAUDI AMERICAN BANK

v.

SHAW GROUP, INC.;
SWINC ACQUISITION THREE, INC.;
SWE&C LIQUIDATING TRUSTEE,
successor to Stone & Webster Engineering Corporation, et al.

Shaw Group, Inc.,
Appellant
_____

Appeal from the United States District Court
for the District of Delaware
(D.C. Civil Action No. 04-cv-00834)
District Judge: Honorable Sue L. Robinson
_____

Argued April 18, 2008

Before: SCIRICA, <u>Chief Judge</u>, AMBRO
and FISHER, <u>Circuit Judges</u>

(Opinion filed: February 24, 2009)

Stephen E. Jenkins, Esquire (Argued)
Catherine A. Strickler, Esquire
Ashby & Geddes
500 Delaware Avenue, 8th Floor
Wilmington, DE   19899

        Counsel for Appellant

Amy B. Abbott, Esquire
Kirkpatrick & Lockhart Preston Gates Ellis
One Lincoln Street
State Street Financial Center
Boston, MA  02111-0000

Bruce S. Barnett, Esquire
Daniel E. Rosenfeld, Esquire (Argued)
DLA Piper
33 Arch Street
Boston, MA   02110

Francis A. Monaco, Jr., Esquire
Kevin J. Mangan, Esquire
Womble, Carlyle, Sandridge & Rice
222 Delaware Avenue, Suite 1501
Wilmington, DE   19810-0000

        Counsel for Appellee

2

AMBRO, <u>Circuit Judge</u>

Stone & Webster, Incorporated ("Stone & Webster") and its subsidiaries—including Stone & Webster Engineering Corporation ("SW Engineering")—filed for Chapter 11 bankruptcy protection in the District of Delaware. Shortly thereafter, Stone & Webster and its subsidiaries entered into an asset purchase agreement ("Purchase Agreement") with the Shaw Group, Inc. ("Shaw") to sell substantially all of their assets. The District Court approved the Purchase Agreement in a Sale and Assumption Order ("Sale Order").

At issue is whether by this transaction Shaw assumed a guaranty obligation of SW Engineering to Saudi American Bank ("SAMBA"). In that rare case where the seller and purchaser agree, SW Engineering and Shaw have argued that the latter did not assume the guaranty.[1] SAMBA contends otherwise.

---

[1] While SW Engineering is not a party to this appeal (even though it is listed in the case caption), it previously argued before the Bankruptcy Court that Shaw did not assume liability for the guaranty obligation or a related "Payment Letter." *See* SW Engineering's Answer, Affirmative Defenses, and Counterclaims, *Saudi American Bank v. Shaw Group, Inc.* (*In re*

The District Court, through a different Judge than the one who entered the Sale Order, agreed with SAMBA's view and granted summary judgment in its favor. In separate proceedings, the Court also awarded SAMBA pre- and post-judgment interest on the guaranteed debt, as well as attorneys' fees and other litigation costs.

---

*Stone & Webster, Inc.*), Ch. 11 Case No. 00-02142, Adv. No. 01-07766, at 10–11, 15–16 (Bankr. D. Del. Oct. 29, 2001) ("[T]he [Payment] Letter and the 1994 Guarantee are not Assumed Liabilities within the meaning of the [Purchase Agreement] and were not assumed by the Shaw Parties thereunder."). The SWE&C Liquidating Trustee, the post-confirmation successor to SW Engineering, also agreed to terms in a Settlement Agreement with SAMBA that stated with regard to this case: "Nothing in this Agreement shall obligate the debtors [including SW Engineering and Stone & Webster] to alter their position that SAMBA does not have a valid claim against Shaw . . . ." Stipulation and Agreed Order Dismissing Adversary Proceeding, Appendix at A508, *Saudi American Bank v. Saudi Arabian Oil Co.* (*In re Stone & Webster, Inc.*), No. 07-3891 (3d Cir. pending).

Shaw additionally has emphasized SW Engineering's agreement with its position throughout its brief. *See, e.g.*, Shaw's Br. at 21 ("There are only two parties to the [Purchase Agreement]—[the Stone & Webster entities] and Shaw—and they *both* agree that Shaw did not assume any liability to SAMBA.").

4

Because we believe the Court misinterpreted the Purchase Agreement and Sale Order, we reverse its grant of summary judgment. While this decision further requires us to vacate the award of pre- and post-judgment interest, attorneys' fees and other litigation costs, we note our agreement with the Court's analysis of those issues.

## I. Factual and Procedural Background

In 1980, SW Engineering formed a joint venture with Abdullah Said Bugshan & Bros. ("Bugshan"), a Saudi Arabian company. The joint venture obtained a contract with the Saudi Arabian American Oil Company ("Aramco") to upgrade an oil refinery at Ras Tanura in Saudi Arabia (known as the "in-kingdom project" or "project number 65004/00"). In a separate contract, SW Engineering agreed to provide manufactured goods to Aramco for use at Ras Tanura (called the "out-of-kingdom project" or "project number 05062011").

To fund the in-kingdom project, the joint venture borrowed $35,000,000 from SAMBA. Bugshan and SW Engineering facilitated the granting of this loan by individually guarantying 50% of the amount owed by the joint venture to SAMBA (in the case of SW Engineering, the "Guaranty"). *See Saudi American Bank v. Shaw Group, Inc.* ("*Saudi American Bank I*"), No. 00-2142, 2005 WL 1036556, at *1 (D. Del. May 3, 2005). Following completion of the in-kingdom project, the joint venture was unable to repay the loan and SW Engineering

5

and Bugshan began making payments pursuant to their guaranties. SW Engineering confirmed its obligation to pay this debt in a 1998 payment letter to SAMBA (the "Payment Letter").

When Stone & Webster and its subsidiaries filed their bankruptcy petitions in 2000, SW Engineering owed SAMBA $6,728,549 on the Guaranty. Shortly after those filings, Shaw purchased substantially all of the Stone & Webster entities' assets through an auction sale. The companies stated the terms of this sale in the Purchase Agreement.

That document, which states that it is governed by Delaware law, labels the assets and liabilities of the sellers as either "assumed" by Shaw or "excluded" from the deal. As is typical, assumed assets and liabilities are those not excluded from the Purchase Agreement. Thus the definitions of Excluded Assets and Excluded Liabilities have controlling importance.

Section 2.02 of the Purchase Agreement defines "Excluded Assets" as all Rejected Contracts, Completed Contracts, and Special Project Claims.

- "Rejected Contracts" are any contracts or related obligations listed by Stone & Webster on Schedule 5.16(b). That schedule lists fifteen projects, none of which relates to SW Engineering's work at the Ras Tanura facility.

- "Completed Contracts" and their related receivables and drawings are "those specifically set forth on Schedule 2.02(b), under which substantially all of the contractual work effort of Sellers has been completed." Included within Schedule 2.02(b) is a notation of the in-kingdom project name, Aramco Ras Tanura (Bugshan), but with the out-of-kingdom project number, 05062011.

- "Special Project Claims" are "any and all claims under the project agreements set forth on Schedule 2.02(e)." That schedule lists the "Ras Tanura, Saudi Arabia, Refinery Upgrade Project," specifically noting the in-kingdom project number (65004/00) and the presence of "one or more potential claims for payment under a series of Letters of Credit issued by [SAMBA]."

The Purchase Agreement defines "Excluded Liabilities" in § 1.01 as

> any and all liabilities or obligations of [Stone & Webster and its subsidiaries] of any kind or nature, other than the Assumed Liabilities, including those liabilities or obligations described in Section 2.04, whether known or unknown, fixed or contingent, recorded or unrecorded, and whether arising before or after the Closing, including . . . surety or other bonds relating to Completed Contracts or Rejected Contracts.

App. at A118. In addition, § 2.04 notes that "Excluded Liabilities" are "liabilities or obligations associated with any Excluded Assets" or "associated with any and all indebtedness of [Stone & Webster and its subsidiaries] for borrowed money not included in the Assumed Liabilities." The phrase "liabilities or obligations" is not defined, but provisions of the Purchase Agreement indicate, as one would expect, that guaranties are liabilities.[2]

Perhaps because the parties were unsure which assets and liabilities were being transferred to Shaw, Sections 2.07 and 5.17 of the Purchase Agreement permit Stone & Webster and its subsidiaries to amend schedules "to reflect any changes required as a result of the addition of applicable Subsidiaries" and to execute any new documents "that may be reasonably necessary or desirable." *Id.* at A133, A158. Section 7.01(a) further explains that any added or amended schedule is "deemed to have been made and delivered as of the Effective Date [of the Purchase Agreement]." *Id.* at A163.

After reviewing the Purchase Agreement, the District

---

[2] For instance, Schedule 2.03, which describes liabilities, lists a guaranty given by Stone & Webster to Enron Power Corporation and includes a reference to "outstanding bank indebtedness." App. at A199. A note at the end of Schedule 3.17(a)(ix) also labels responsibilities from a guaranty as a "liability." *Id.* at A283-84.

Court approved the sale of Stone & Webster's assets in the Sale Order.[3] The Order adopts "all of the terms and conditions" of the Purchase Agreement, but it adds protections for third parties claiming repayment rights under a contract or asset assumed by Shaw. For example, it states that Shaw "will cure . . . any default existing prior to the date hereof under any of the Assumed Contracts." *Id.* at A432 (Paragraph S of the Order). It also states that "all rights and remedies of any non-debtor party or Shaw under any of the Assumed Contracts . . . are fully preserved and shall be fully enforceable after the Closing against Shaw or the non-debtor party . . . ." *Id.* at A437 (Paragraph 12 of the Order). No party objected to the addition of these terms.

Following conclusion of the asset sale, SAMBA filed a cure claim against SW Engineering for payment of $6,728,549 pursuant to the Guaranty.[4] Shaw did not contest this claim until

---

[3] At the time of the sale hearing, the District Court was hearing bankruptcy cases pursuant to 28 U.S.C. § 1334(a).

[4] SAMBA's Statement of Cure Claim also sought $144,430 from SW Engineering on an unrelated letter of credit issued by SAMBA to the joint venture's account. SAMBA had received a demand for payment on the letter of credit from the second advising bank, MISR Romanian Bank of Bucharest, but this payment was stayed by an injunction obtained by SW Engineering. *See* App. at A457–58, A475–89. SAMBA did not request payment from Shaw of the $144,430 in the complaint that began the case before us. *See Saudi American Bank I*, 2005

it filed its Second Omnibus Objection to Claims in April 2001. *See id.* at A1078–90. SAMBA thereafter filed suit against Shaw and SW Engineering in the Bankruptcy Court for the District of Delaware. SAMBA asked the Court to determine that the Guaranty and Payment Letter were Assumed Liabilities for which Shaw was responsible, or, in the alternative, to allow SAMBA's cure claim as an unsecured claim against SW Engineering. After successfully moving for a withdrawal of the proceeding to the District Court, Shaw answered SAMBA's claim with a motion for summary judgment.[5] Shaw alleged that SAMBA lacked standing to sue under the Purchase Agreement and claimed that SW Engineering's Guaranty and Payment

WL 1036556, at *4.

[5] The docket sheet and District Court opinions indicate that SW Engineering joined Shaw's motion for summary judgment. *See* App. at A56–61 ("Motion for Summary Judgment Filed by The Shaw Group, Inc. and SWINC Acquisition Three, Inc., and Stone & Webster Engineering Corporation . . . (Entered: 08/13/2002)."); *Saudi American Bank I*, 2005 WL 1036556, at *1 (identifying SW Engineering as a defendant and stating that "[p]resently before the court are plaintiff's and defendants' motions for summary judgment"); *Saudi American Bank v. Shaw Group, Inc.*, 354 B.R. 686, 687 (D. Del. 2006) (describing SW Engineering as a defendant and recounting that "[p]laintiffs and defendants filed motions for summary judgment"). SW Engineering, however, was not a party to the cross-motions for summary judgment.

10

Letter were Excluded Liabilities for which Shaw was not responsible.[6] SAMBA counterclaimed with its own motion for summary judgment.

The District Court granted SAMBA's summary judgment motion and denied that of Shaw. In reaching its decision, the Court made two principal rulings. First, it held that SAMBA had standing to bring its suit. *See Saudi American Bank I*, 2005 WL 1036556, at *5 n.11. Second, it determined that "the Guaranty and Payment Letter are contracts that were assumed by defendant Shaw by operation of the [Purchase Agreement] and [Sale Order]." *Id.* at *7. The Court believed the Guaranty and Payment Letter were "separate contract[s]" that were not "unambiguously" listed as Excluded Assets or Excluded

---

[6] SAMBA now asserts that Shaw was equitably estopped from asserting that it did not assume SW Engineering's liability to SAMBA because Shaw failed timely to contest SAMBA's cure claim. As SAMBA did not present this equitable estoppel argument to the District Court, it is waived. *See Union Pac. R.R. Co. v. Greentree Transp. Trucking Co.*, 293 F.3d 120, 126 (3d Cir. 2002). The failure to present this argument is easily understood, as equitable estoppel would need to involve misleading conduct by Shaw and detrimental reliance by SAMBA, not simply a failure timely to contest the cure claim. *See Bechtel v. Robinson*, 886 F.2d 644, 650 (3d Cir. 1989) (explaining that, under Delaware law, equitable "estoppel may arise when a party by his conduct . . . leads another, in reliance upon that conduct, to change position to his detriment").

Liabilities under the Purchase Agreement. *Id.* at *6–7. In so reasoning, it rejected Shaw's argument that the Guaranty and Payment Letter were excluded by association with the in-kingdom project's listing as a Completed Contract or a Special Project Claim. The Court considered only the Purchase Agreement and Sale Order in reaching its decision. Among the evidence it did not consider was the declaration of James P. Carroll, the President and Chief Restructuring Officer for Stone & Webster, who supported Shaw's claim that the Guaranty and Payment Letter were Excluded Liabilities.[7] *See id.* at *5 n.10.

In separate, but related, adversary proceedings, the District Court considered whether Shaw, as the party the Court ruled to have assumed the Guaranty, owed SAMBA pre- and post-judgment interest, attorneys' fees and related costs under the terms of the Guaranty. *See Saudi American Bank v. Shaw Group, Inc.* ("*Saudi American Bank II*"), 354 B.R. 686, 688–93 (D. Del. 2006). On the matter of pre-judgment interest, the Court applied New York law and held that the Guaranty set an

---

[7] Although it is not relevant to our determination of this case, we note that the District Court properly excluded Carroll's declaration at summary judgment review. *See MBIA Ins. Corp. v. Royal Indem. Co.*, 426 F.3d 204, 214 n.4 (3d Cir. 2005) ("[I]n determining whether an ambiguity exists a court may consider only undisputed background facts . . . . '[U]ndisputed background facts' do not include the self-serving parol evidence submitted by the parties . . . .").

interest rate of 9%. *See id.* at 690–91. It also awarded SAMBA $345,714.50 in attorneys' fees along with $20,750.00 in costs. *See id.* at 692; *Saudi American Bank v. Shaw Group, Inc.* ("*Saudi American Bank III*"), 360 B.R. 64, 67 (D. Del. 2007). Lastly, the Court awarded SAMBA post-judgment interest at a rate of 3.33%. *See Saudi American Bank II*, 354 B.R. at 693.

Shaw appealed the decisions of the District Court. We consolidated the cases for review.

## II.    Jurisdiction and Standard of Review

The District Court had jurisdiction under 28 U.S.C. §§ 157 and 1334. We have jurisdiction under 28 U.S.C. § 1291.

We exercise plenary review over the District Court's grant of summary judgment. *Atkinson v. Lafayette Coll.*, 460 F.3d 447, 451 (3d Cir. 2006). Summary judgment is appropriate if there is "no genuine issue as to any material fact" and the party making the motion "is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). "In determining whether a genuine issue of fact exists, we resolve all factual doubts and draw all reasonable inferences in favor of the nonmoving party." *Conoshenti v. Pub. Serv. Elec. & Gas Co.*, 364 F.3d 135, 140 (3d Cir. 2004). We may affirm or vacate the District Court's judgment on any grounds supported by the record. *In re Teleglobe Commc'ns Corp.*, 493 F.3d 345, 385 (3d Cir. 2007).

13

We engage in plenary review of questions of contract interpretation. *See Jumara v. State Farm Ins. Co.*, 55 F.3d 873, 880–81 (3d Cir. 1995).

As different District Judges were involved in approving the Purchase Agreement by the Sale Order and in interpreting that Order, this is not a case where the District Judge is afforded special deference in interpreting her own order.

## III.    Discussion

We review three issues: (1) whether the District Court erred in holding that SAMBA had standing to bring a claim against Shaw; (2) whether summary judgment in favor of SAMBA was proper; and (3) whether the Court correctly awarded SAMBA pre- and post-judgment interest, attorneys' fees and other costs of litigation.

### A.    Standing

In determining whether SAMBA has standing to sue under the Purchase Agreement for payment of SW Engineering's guaranty of the in-kingdom project loan, Shaw focuses on § 10.08 of the Purchase Agreement. It states:

> No Third Party Beneficiary. The terms and provisions of this Agreement . . . are intended solely for the benefit of the parties . . . and their

14

respective successors and permitted assigns, and are not intended to confer third-party beneficiary rights upon any other Person.

Shaw argues that this provision, typical in sale-of-asset agreements, denies SAMBA standing as a third-party beneficiary by stating that only the debtors (*i.e.*, the Stone & Webster entities) have standing to sue Shaw under the Purchase Agreement. According to this argument, SAMBA should have brought its claim for payment of the Guaranty and Payment Letter only against SW Engineering, which could then have sought indemnification from Shaw if it paid SAMBA and believed that the Guaranty and Payment Letter were assumed by Shaw.[8]

Shaw's argument is no doubt plausible. "Ordinarily, a stranger to a contract acquires no rights thereunder." *Guardian Constr. Co. v. Tetra Tech Richardson, Inc.*, 583 A.2d 1378,

---

[8] Shaw presents two other arguments for consideration in its brief. First, it asserts that the Guaranty and Payment Letter were not "Contracts" that granted SAMBA enforcement rights under the Sale Order's third-party beneficiary provisions. Second, Shaw claims that the Guaranty and Payment Letter are non-executory contracts incapable of being assigned to it. As Shaw failed to present either of these arguments to the District Court, they are waived on appeal. *See Pension Benefit Guar. v. White Consol. Indus., Inc.*, 215 F.3d 407, 418–19 (3d Cir. 2000).

1386 (Del. Super. Ct. 1990). According to Delaware law, which governs the Purchase Agreement, "to qualify as a third party beneficiary of a contract, (a) the contracting parties must have intended that the third party beneficiary benefit from the contract, (b) the benefit must have been intended as a gift or in satisfaction of a pre-existing obligation to that person, and (c) the intent to benefit the third party must be a material part of the parties' purpose in entering into the contract." *E.I. DuPont de Nemours & Co. v. Rhone Poulenc Fiber & Resin Intermediates, S.A.S.*, 269 F.3d 187, 196 (3d Cir. 2001). In this case, we are not aware of evidence that Shaw intended to confer direct benefits to SAMBA through the Purchase Agreement; in fact, § 10.08 makes clear that Shaw did not intend to give enforceable rights to any third party. Thus, on the basis of the Purchase Agreement alone, SAMBA arguably does not have standing.

The Purchase Agreement, however, is not the only document relevant to determining SAMBA's rights. The Sale Order approving the Purchase Agreement includes language protecting the rights of third parties. Paragraph 12 of the Order states that "all rights and remedies of any non-debtor party or Shaw under any of the Assumed Contracts . . . are fully preserved and shall be fully enforceable after the Closing against Shaw or the non-debtor party . . . ." App. at A437. This language supersedes § 10.08 of the Purchase Agreement. *See Caldwell Trucking PRP v. Rexon Tech. Corp.*, 421 F.3d 234, 245 (3d Cir. 2005) (explaining that "general, boilerplate language" prohibiting third-party actions "must yield to the

16

specific direction" of separate contractual provisions granting third parties enforceable rights in assumed liabilities); *see also In re Safety-Kleen Corp.*, 380 B.R. 716, 740 (D. Del. 2008) ("When a buyer expressly assumes liabilities of a seller, it becomes directly liable therefore, regardless of any language in the sale agreement otherwise purporting generally to disclaim third-party beneficiary rights.").

In this context, SAMBA, a non-debtor, has standing to claim that Shaw has assumed SW Engineering's guaranty of the in-kingdom project loan. We therefore affirm the District Court's determination of this issue.[9]

## B.    Summary Judgment

Based on the standard already noted, summary judgment is appropriate if no genuine issue of material fact exists over whether Shaw assumed SW Engineering's guaranty of the in-kingdom project loan. Settling this issue requires us to ascertain the intentions of Shaw and the Stone & Webster entities as set out in the Purchase Agreement and Sale Order. *See Eagle*

_____

[9] Shaw claims that by this conclusion "every . . . part[y] who d[oes] not like the status it was assigned under the Purchase Agreement ha[s] standing to sue Shaw." Shaw's Br. at 33. Shaw, however, agreed to the Sale Order, and we are simply following what it states. *See Saudi American Bank I*, 2005 WL 1036556, at *7.

*Indus., Inc. v. DeVilbiss Health Care, Inc.*, 702 A.2d 1228, 1232 (Del. 1997). The District Court determined that these documents unambiguously proved that "the Guaranty and Payment Letter are contracts that were assumed by defendant Shaw." *Saudi American Bank I*, 2005 WL 1036556, at *7. We reach the opposite conclusion.

In its review of the Purchase Agreement and Sale Order, the District Court considered only whether the Guaranty and Payment Letter were specifically listed as Excluded Liabilities. It did not question whether they were excluded by way of association with the excluded in-kingdom project. The Court decided not to consider this possibility based on its application of the "fundamental premise that a guaranty 'is a separate contract . . . from the basic contract to which it is collateral.'" *Id*. at *6 (quoting *FinanceAmerica Private Brands, Inc. v. Harvey E. Hall, Inc.*, 380 A.2d 1377, 1379 (Del. Super. Ct. 1977)). This premise, it concluded, controlled interpretation of the parties' agreements.

We disagree with the Court's premise that the Guaranty and Payment Letter's association with the in-kingdom project is irrelevant to their classification as assumed or excluded liabilities. To be sure, case law establishes that "a guaranty and the underlying contract are separate contracts." *Saudi American Bank I*, 2005 WL 1036556, at *6 n.12. But that law does not answer whether the parties intended to include the Guaranty and Payment Letter under a listing of the in-kingdom project.

18

Instead, the general law of contract, that agreements are enforced "in accord with their makers' intent," must control. *MBIA Ins. Corp. v. Royal Indem. Co.*, 426 F.3d 204, 210 (3d Cir. 2005). In this case, the parties expressed a clear intent to associate guaranties and other liabilities or obligations with their underlying contracts.

As discussed, the Purchase Agreement contains several sections that define liabilities as excluded based on their association with excluded contracts. Section 2.04, as noted above in part, describes "Excluded Liabilities" as

> (a) liabilities . . . other than Assumed Liabilities; . . . (c) liabilities or obligations associated with any Excluded Assets; (d) liabilities or obligations associated with any and all indebtedness of [Stone & Webster and its subsidiaries] for borrowed money not included in the Assumed Liabilities; [and] (e) liabilities or obligations under the Assumed Contracts that are not Assumed Liabilities and liabilities or obligations arising under the Rejected Contracts or the Completed Contracts.

App. at A129. Under clauses (c), (d), or (e), a liability need only be "associated with" an Excluded Asset or a debt not an Assumed Liability, or "aris[e] under" a Rejected or Completed Contract, to qualify as an "Excluded Liability." Excerpts from

19

the transcript of the Sale Order hearing further indicate that the parties and the Court understood that a listing of an excluded contract also included "all liabilities arising under th[at] . . . contract." *Id.* at A792; *see also id.* at A762, A767–75, A789. Thus, the Guaranty and Payment Letter may be Excluded Liabilities if the in-kingdom project with which they are associated is listed as an Excluded Asset.[10]

Recognizing the importance of whether the in-kingdom

--------------------------------------------------

[10] SAMBA argues against associating the Guaranty and Payment Letter with the in-kingdom project because neither SW Engineering nor Stone & Webster had "any involvement whatsoever in [the project's] execution and performance." SAMBA's Br. at 4. It also claims that use of the loan secured by the Guaranty was not limited to the in-kingdom project. *Id.* at 5–7. It is evident, however, that SW Engineering had an equity stake in the joint venture, *see* App. at A516, and that SW Engineering included contracts related to the in-kingdom project in its bankruptcy estate. *See id.* at A212. Furthermore, internal SAMBA documents and the deposition transcript of Sheheryar Ali, SAMBA's Assistant General Manager, indicate that the Guaranty was linked exclusively to the loan given by SAMBA to the joint venture to finance the in-kingdom project. *See id.* at A77–96, A294; *see also* SAMBA's Br. at 5 ("SAMBA has never denied that its initial loan to [the joint venture] was for the stated purpose of providing working capital that could be used for the In-Kingdom Contract and that Contract was, initially, the primary source of payment of the loan.").

20

project is an assumed or excluded liability, our review turns to the schedules that identify the three types of Excluded Assets: Rejected Contracts, Completed Contracts, and Special Project Claims.

First, all parties agree that the in-kingdom project is not a Rejected Contract. Schedule 5.16(b) of the Purchase Agreement lists the Rejected Contracts and contains no mention of the in-kingdom project.

Second, the in-kingdom project's status as a Completed Contract is ambiguous. Completed Contracts, to repeat, are "those specifically set forth on Schedule 2.02(b), under which substantially all of the contractual work effort of [the Stone & Webster entities] has been completed." *Id.* at A117. To repeat, Schedule 2.02(b) references the in-kingdom project name, Aramco Ras Tanura (Bugshan)/Refinery Upgrade, but does so in conjunction with the out-of-kingdom project number, 05062011. *See id.* at A196. Shaw argues that this reference proves that the parties meant to exclude both contracts. *See* Shaw's Br. at 15–16. SAMBA asserts that the project number should control and faults Shaw and SW Engineering for not clarifying the schedule. *See* SAMBA's Br. at 18–19, 53–54; Or. Arg. Tr. at 17. We are not convinced either way. The listing of the in-kingdom project name is significant, but the record does not show conclusively what the parties to the Purchase Agreement intended it to mean.

21

Third, the schedule of Special Project Claims unambiguously lists the in-kingdom project as an Excluded Asset. Schedule 2.02(e) excludes "any and all claims and liabilities" related to the "Ras Tanura, Saudi Arabia, Refinery Upgrade Project," and specifies the in-kingdom project. App. at A212. In particular, the schedule lists:

> Contract for Construction dates as of June 28, 1994 by and between Saudi Arabian Oil Company ("Saudi Aramco") and BS&W [the joint venture] (designated by Saudi Aramco as Contract No. 65004/00).
> . . .
> Contract retainage due to BS&W [the joint venture] in the amount of $5,757,000 on Contract No. 65004/00 . . . .
> . . .
> One or more potential claims for payment under a series of Letters of Credit issued by Saudi American Bank . . . .

*Id.* This listing is decisive. It excludes the in-kingdom project by name and number, and it makes clear that the Stone & Webster entities retain the claims and liabilities of the Ras Tanura Upgrade Project. The in-kingdom project is thus an Excluded Asset under the Purchase Agreement, and the Guaranty and Payment Letter are Excluded Liabilities because

22

they are associated with that Excluded Asset.[11]

---

[11] The District Court did not consider this reasoning because "Schedule 2.02(e) was added to the [Purchase Agreement] by debtor and defendant Shaw subsequent to [the District Court]'s approval of the Execution Copy of the [Purchase Agreement]." *Saudi American Bank I*, 2005 WL 1036556, at *3 n.6. But the Court did consider as relevant other schedules added to the Purchase Agreement on the same day as Schedule 2.02(e). *See, e.g.*, *id.* at *3 & *7 (reviewing the contents of Schedule 3.17(a)(ix)). And, as mentioned, Sections 2.07 and 5.17 of the Purchase Agreement permit the Stone & Webster entities to amend and add schedules, *see* App. at A133 & A158, and § 7.01(a) explains that any added schedule is "deemed to have been made and delivered as of the Effective Date [of the Purchase Agreement]." *Id.* at A163.

SAMBA also argues that we should not consider the relevance of Schedule 2.02(e) because (1) paragraph 31 of the Sale Order provides that the Purchase Agreement "could not be modified without an order of the Court, unless the modification would not have a material adverse effect on Debtors' estates," and (2) Shaw's counsel stated at the sale hearing in July 2000 that "the contracts that are in [the Purchase Agreement] are now fixed." SAMBA's Br. at 55. We reject both arguments.

First, the sections of the Purchase Agreement permitting amendment of schedules were not modified or added to the Agreement after the issuance of the Sale Order. Also, as noted by SAMBA's counsel at oral argument, it is "uncontested" that Stone & Webster was the party that filed Schedule 2.02(e). Or. Arg. Tr. at 21. Adding the schedule was thus sanctioned by the

The conclusion that the Guaranty and Payment Letter are Excluded Liabilities by way of association with an excluded Special Project Claim is further supported by SW Engineering's stated Answer, Affirmative Defenses, and Counterclaims to SAMBA's initial complaint. Denying that the Guaranty and Payment letter were assumed by Shaw, SW Engineering asserted:

> Both the [Payment] Letter and the 1994 Guarantee are Special Project Claims (as defined in section 1.01 and on schedule 2.02(e) of the [Purchase Agreement]), defined as "[a]ny and all claims or liabilities available at law or in equity, or arising under the project agreements in Saudi Arabia for the Ras Tanura Refinery Upgrade Project ("RTRUP")—Package 2—Utilities . . . ."

---

District Court and was not materially adverse to Stone & Webster's interests.

Second, counsel's remark about the contracts being "fixed" says nothing about the parties' ability to add contracts or adjust the schedules. In fact, counsel's statements immediately following the "fixed" remark focus on "preserving the right for [Stone & Webster] to say . . . [a contract]'s in, and Shaw to say . . . it's out," and discuss the parties' belief that further negotiations would be necessary to clarify "material misunderstandings about what the effect of this contract on the estate is." App. at A736–43.

24

[Purchase Agreement] at schedule 2.02(e). . . . Under the specific terms of the [Purchase Agreement], the Special Project Claims are Excluded Assets (as defined therein) and were not assumed by the Shaw Parties . . . . *Additionally, any liabilities or obligations associated with any Excluded Assets (including the Special Project Claims) are Excluded Liabilities (as defined in the [Purchase Agreement]) and were not assumed by the Shaw Parties.*

SW Engineering's Answer, Affirmative Defenses, and Counterclaims, *Saudi American Bank v. Shaw Group, Inc.* (*In re Stone & Webster, Inc.*), Ch. 11 Case No. 00-02142, Adv. No. 01-07766, at 10–11 (Bankr. D. Del. Oct. 29, 2001) (emphasis added). Rarely is such a clear statement offered by a debtor against its interests. By refusing to claim that Shaw was obligated to pay the balance of SAMBA's loan, SW Engineering eliminated its surest avenue to avoiding liability for the debt and reinforced the status of the Guaranty and Payment Letter as Excluded Liabilities.

In concluding that Shaw did not assume liability for SW Engineering's guaranty of the in-kingdom project loan, we additionally reject SAMBA's assertions that the Guaranty and Payment Letter are Assumed Liabilities or Assumed Contracts. These assertions rely on unreasonable interpretations that do not overcome the unambiguous language of the Purchase

25

Agreement and Sale Order.

To begin, SAMBA's attempt to label the Guaranty and Payment Letter as Assumed Liabilities under Schedules 2.03 and 3.17(a)(ix) is misleading. Schedule 2.03 states that Assumed Liabilities include "[l]iabilities under [the Stone & Webster entities'] outstanding bank indebtedness" and "other liabilities related to the . . . Assumed Contracts." App. at A199. Schedule 3.17(a)(ix) lists all of the Stone & Webster entities' indebtedness "relating to the borrowing of money or indirect guarantee[s]." *Id.* at A139. Included within Schedule 3.17(a)(ix) is a listing for a letter of guaranty dated September 1, 1992 from SW Engineering to SAMBA for $5,000,000, and a letter of guaranty dated October 19, 1992 from SW Engineering to SAMBA for repayment of 40,000,000 Saudi Riyals. *Id.* at A282–83.

Reading these schedules somehow to include the Guaranty, SAMBA asserts that they provide "undisputed evidence . . . that [SW Engineering]'s obligation to SAMBA constitutes [an Assumed Liability] under [SW Engineering]'s outstanding bank indebtedness." SAMBA's Br. at 21. This overstatement underwhelms, as neither of the guaranties referenced in Schedule 3.17(a)(ix) is related to the Guaranty, which was issued October 11, 1994, for $35,000,000—not September 1992 for $5,000,000 or October 1992 for 40,000,000 Saudi Riyals (as noted, the dates and amounts of the guaranties listed in Schedule 3.17(a)(ix)). *See* App. at A73–76, A92–93.

26

SAMBA claims that this discrepancy is unimportant because "Shaw has admitted that it assumes that the guaranty listed on Schedule 3.17(a)(ix) incorporates the Guaranty." SAMBA's Br. at 22. This statement misrepresents Shaw's actual response that it "currently assumes that this is the same guaranty (and it knows of no other), but there appears to be no direct way to confirm (or deny) this point." App. at A496.[12]

SAMBA is also incorrect in labeling the Guaranty and Payment Letter as Assumed Contracts. The Purchase Agreement defines "Assumed Contracts" as "all Contracts of Sellers (including the Employee Agreements) other than the Rejected Contracts and the Completed Contracts." *Id.* at A114. SAMBA claims that the Guaranty and Payment Letter fall within this definition because they are "Contracts" under the

---

[12] Even if the Guaranty and Payment Letter were included within the guaranties listed in Schedule 3.17(a)(ix), their placement there would not be conclusive of their assumed status. The Purchase Agreement anticipates in Sections 1.01 and 3.17 that there are liabilities and obligations listed in Schedule 3.17(a)(ix) that are elsewhere excluded through specific mention or association with an Excluded Asset. There is no reason why the Guaranty and Payment Letter at issue here would not be such liabilities if, in fact, they were listed in Schedule 3.17(a)(ix).

27

Purchase Agreement,[13] and they are not specifically listed in the schedules of Rejected or Completed Contracts.[14] We dismiss this claim as an illogical interpretation of the Purchase Agreement and Sale Order.

"It is a general rule of contract construction to 'consider the entire instrument and attempt to reconcile all of its provisions in order to determine the meaning intended to be given to any portion of it.'" *In re IAC/Interactive Corp.*, 948 A.2d 471, 497 (Del. Ch. 2008) (quoting *Wood v. Coastal States Gas Corp.*, 401 A.2d 932, 937 (Del. 1979)). "Moreover, the meaning which arises from a particular portion of an agreement cannot control the meaning of the entire agreement where such inference runs counter to the agreement's overall scheme or

---

[13] As defined in § 1.01 of the Purchase Agreement, "Contracts" are "all commitments, contracts, leases, licenses, agreements and understandings, written or oral, relating to the Assets or the operation of the Business to which any [Stone & Webster entity] is a party or by which it or any of its Assets are bound." *Id.* at A117.

[14] In its brief, SAMBA also cites page A882 of the Appendix to support an assertion that the "Guaranty and Payment Letter were listed on the Second Amended Assumed Contract List." SAMBA's Br. at 23. Page A882 is merely a title page for the Amended Assumed Contracts Lists, and a search of the preceding and following pages reveals no specific mention of the Guaranty or Payment Letter.

plan." *E.I. du Pont Nemours & Co., Inc. v. Shell Oil Co.*, 498 A.2d 1108, 1113 (Del. 1985).

The overall scheme of the Purchase Agreement and Sale Order, as noted above, is for Shaw to assume all assets and obligations of the Stone & Webster entities except for those listed as Excluded Assets or Excluded Liabilities. SAMBA's labeling of the Guaranty and Payment Letter as "Assumed Contracts" turns that scheme on its head by making Shaw liable for what are Excluded Liabilities via their association with an excluded Special Project Claim (the in-kingdom project).[15]

---

[15] At oral argument, SAMBA asserted that paragraphs 12 and 22 of the Sale Order reversed the Purchase Agreement's general rule that Excluded Liabilities cannot create liabilities assumed by Shaw. *See* Or. Arg. Tr. at 22-28, 36, 39-43. This claim is waived because SAMBA raised it for the first time at oral argument. *See Montrose Med. Group Participating Sav. Plan v. Bulger*, 243 F.3d 773, 783 (3d Cir. 2001).

Even were the claim not waived, it misses on the merits. Paragraph 12 of the Sale Order states, in part, that "Shaw is assuming all liabilities arising under the Assumed Contracts." App. at A437. Paragraph 22 reads: "Under no circumstances shall any holder of an Excluded Liability be able to commence, continue or otherwise pursue or enforce any remedy, claim or cause of action against Shaw . . . except with respect to the liabilities assumed under an Assumed Contract by Shaw pursuant to paragraph 12 of this Sale Order." *Id.* at A442. Contrary to SAMBA's claim, these provisions—like similar

Furthermore, were we to extend SAMBA's logic to other Excluded Assets and Excluded Liabilities, we would in effect be reading entire sections and schedules out of the Purchase Agreement. All items only listed as, or associated with, Special Project Claims, for example, would no longer be distinctly excluded because they too would be "Contracts . . . other than the Rejected Contracts and the Completed Contracts." App. at A114 (defining "Assumed Contracts"). To adopt such a far-reaching interpretation would violate "the cardinal rule of contract construction that, where possible, a court should give effect to all contract provisions." *E.I. du Pont*, 498 A.2d at 1114; *see also New Castle County, Del. v. Nat'l Union Fire Ins. Co. of Pittsburgh*, 174 F.3d 338, 350 (3d Cir. 1999).

Lastly, we disagree with SAMBA's assertion that the transcripts of the sale hearings show that the Guaranty and Payment Letter are Assumed Liabilities or Assumed Contracts

clauses in paragraphs 7, 10, 17, 21, and 25 of the Sale Order—merely preserve the ability of non-debtor parties to assert their rights under an Assumed Contract. Paragraph 9 of the Sale Order confirms that paragraphs 12 and 22 do not alter the Purchase Agreement's distinction between Excluded Liabilities and liabilities under Assumed Contracts, stating "[SW Engineering]'s assumption and assignment to Shaw, and Shaw's assumption *on the terms set forth in the [Purchase] Agreement*, of the Assumed Contracts [are] hereby approved . . . ." *Id.* at A435 (emphasis added).

because they were not identified as Rejected or Completed Contracts before entry of the Sale Order. SAMBA assigns particular significance to the representations made by counsel for the Committee of Unsecured Creditors at the sale hearing in July 2000 that

> [t]his agreement revolves, in terms of its economics, around three schedules, or let's say two schedules, and whether or not your contract is on one of those two schedules. And those two schedules are the schedule for rejected contracts and the schedule for completed contracts. If they are not on those schedules, in essence, your contract is an assumed contract, and the economic impact to you as a stakeholder is dependent upon whether you are on those two lists . . . .

*Saudi American Bank I*, 2005 WL 1036556, at \*2.

We do not see how this statement establishes with certainty that the Guaranty and Payment Letter are Assumed Contracts or Assumed Liabilities. The statement oversimplifies the terms of the Purchase Agreement, does not discuss the relevance of the "liabilities and obligations" associated with Excluded Assets, and fails to mention the importance of the Special Project Claims. Other statements from the sale hearing transcript, moreover, show that the District Court did not think that the provisions of the Purchase Agreement were settled when

31

it issued the Sale Order. *See, e.g.*, App. at A788 ("I will allow [the parties to adjust the schedules after approval of the Purchase Agreement], with the understanding that we may end up having to deal with adjustments and the economic impact of adjustments."); A798 ("I would rather leave Shaw and the debtor as much flexibility as they can to try and make adjustments, because I understand it is going to be complicated.").

The record is clear: the Guaranty and Payment Letter are Excluded Liabilities because they are associated with the in-kingdom project, which is an excluded Special Project Claim. We therefore reverse the District Court's grant of summary judgment.[16]

---

[16] Because we hold that the Guaranty was not assumed by Shaw, SAMBA's claim for repayment should now be treated as a Proof of Claim against SW Engineering, as expressly reserved in SAMBA's Statement of Cure Claim. *See* App. at A458 ("In the event it is determined that the Guaranty is not a contract assumed by Shaw, . . . [SAMBA] hereby claims the right to have such portion of its claim treated as a Proof of Claim, rather than a Statement of Cure Claim."). SAMBA's ability to recover payment under a Proof of Claim, however, is limited by the terms of its May 2003 Settlement Agreement with SW Engineering and the other Stone & Webster entities. *See* Stipulation and Agreed Order Dismissing Adversary Proceeding, Appendix at A500–10, *Saudi American Bank v. Saudi Arabian Oil Co.* (*In re Stone & Webster, Inc.*), No. 07-

3891 (3d Cir. pending). That Agreement resolved all disputes related to a preference action filed by SW Engineering against SAMBA and SAMBA's claims under the Guaranty and Payment Letter. The specific terms of the Agreement state:

WHEREAS the Parties have agreed to settle the disputes involved in the Preference Action and SAMBA's contingent claims against [SW Engineering] as set forth herein;

NOW, THEREFORE, . . . the Parties agree as follows:

1.  [SW Engineering] shall make a one-time cash payment of One Million Dollars ($1,000,000) to SAMBA . . . .

2.  SAMBA will have an allowed general, unsecured claim in the amount of Two Million Five Hundred Thousand ($2,500,000) against [SW Engineering].
    . . . .

5.  Except for the rights and obligations expressly provided or reserved hereunder[,] SAMBA . . . hereby releases, remises and forever discharges the [Stone & Webster entities] . . . from any and all claims and causes of action . . . that SAMBA ever had, now has or may have, for acts, events or occurrences . . . based upon the Proof of Claim, the Cure Claim, the Payment Letter, or the Guarantee, or

**C.    Interest, Attorneys' Fees and Other Litigation
Costs**

Because we reverse the District Court's grant of summary
judgment, we must also vacate its subsequent awards to
SAMBA, and against Shaw, of pre- and post-judgment interest,
attorneys' fees and other litigation costs.  We nonetheless agree
with the Court's analysis of these issues had they applied to SW
Engineering.

With respect to the award of pre-judgment interest, we
specifically agree with the District Court's reliance on the
Guaranty's choice of New York law and its assignment of a 9%
interest rate running from May 31, 2000.[17]  We likewise concur

---

that were or could have been asserted by
SAMBA in the Proof of Claim or the Cure
Claim.

*Id.* at A506–07; *see also Saudi American Bank III*, 360 B.R. at
66 (discussing the Settlement Agreement).    Accordingly,
SAMBA may recover no more than $2.5 million from SW
Engineering through a Proof of Claim.

[17] Despite the Guaranty's statement that it "shall be governed
by the laws of the State of New York," SAMBA sought
application of Delaware's legal interest rate of 11%. *See Saudi
American Bank II*, 354 B.R. at 689–91.    Shaw argued in
response that SAMBA was not entitled to receive interest on the

34

in the Court's application of 28 U.S.C. § 1961 to establish a 3.33% post-judgment interest rate. *See Saudi American Bank II*, 354 B.R. at 693.[18]

---

sum because the joint venture's "obligation to SAMBA ultimately arose under and is determined by the Credit Agreement, and . . . Payment Letter," which are controlled by Saudi law that forbids the collection of interest. *Id.* at 690. The District Court concluded that the terms of the Guaranty controlled in all respects, granting SAMBA pre-judgment interest at New York's interest rate of 9%. *See id.* at 690–91; N.Y. C.P.L.R. §§ 5001(a) & 5004. The Court distinguished the Guaranty from the Credit Agreement by reiterating that a guaranty "is a separate contract involving duties and responsibilities which are different from the basic contract to which it is collateral." *Saudi American Bank II*, 354 B.R. at 690 (quoting *FinanceAmerica*, 380 A.2d at 1379). It applied New York's interest rate because it determined that Delaware, whose law would control in the absence of the parties' choice of law, did not have a "materially greater" interest in the subject matter than New York. *Id.* at 691 (quoting *Hionis Int'l Enters., Inc. v. Tandy Corp.*, 867 F.Supp. 268, 271 (D. Del. 1994)).

[18] 28 U.S.C. § 1961(a) states in part: "Interest shall be allowed on any money judgment in a civil case recovered in a district court. . . . Such interest shall be calculated from the date of the entry of the judgment, at a rate equal to the weekly average 1-year constant maturity Treasury yield . . . for the calendar week preceding the date of the judgment."

Regarding litigation expenses, we approve the Court's determination that the Guaranty's promise of reimbursement for "any and all expenses incurred [by SAMBA] in enforcing [its] rights under this Guaranty" entitles SAMBA to reasonable attorneys' fees and other costs of litigation. *Saudi American Bank II*, 354 B.R. at 691–3. Any reward recovered under the language of the Guaranty, however, must be limited to the fees and costs directly incurred in enforcing rights against SW Engineering under that instrument. *See id.* at 692.

## IV.    Conclusion

We affirm the conclusion of the District Court that SAMBA has standing to challenge the status of its claim under the Purchase Agreement. We reverse the Court's grant of summary judgment to SAMBA, and we vacate its orders requiring Shaw to pay pre- and post-judgment interest, attorneys' fees and other litigation costs. We further remand the matter to the District Court for proceedings consistent with this opinion.